# REPUBLICAN PARTY OF MINNESOTA ET AL. v. WHITE, CHAIRPERSON, MINNESOTA BOARD OF JUDICIAL STANDARDS, ET AL.

No. 01–521.   Argued March 26, 2002—Decided June 27, 2002

766

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., *post*, p. 788, and KENNEDY, J., *post*, p. 792, filed concurring opinions. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 797. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 803.

*James Bopp, Jr.*, argued the cause for petitioners Republican Party of Minnesota et al. With him on the briefs were

*Thomas J. Marzen, Richard E. Coleson,* and *Ronald D. Rotunda. William F. Mohrman* and *Erick G. Kaardal* filed briefs for petitioners Wersal et al.

*Alan I. Gilbert,* Chief Deputy and Solicitor General of Minnesota, argued the cause for respondents. With him on the brief were *Mike Hatch,* Attorney General, *Kristine L. Eiden,* Deputy Attorney General, and *Julie Ralston Aoki, Mark B. Levinger,* and *Thomas C. Vasaly,* Assistant Attorneys General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Center for Law and Justice by *Jay Alan Sekulow, James H. Henderson, Sr., Colby M. May,* and *Walter M. Weber;* for the American Civil Liberties Union et al. by *David B. Isbell, David H. Remes,* and *Steven R. Shapiro;* for the Chamber of Commerce of the United States by *Jan Witold Baran* and *Stephen A. Bokat;* for Minnesota State Representative Philip Krinkie et al. by *Raymond C. Ortman, Jr.;* for Public Citizen by *Allison M. Zieve, David C. Vladeck,* and *Scott L. Nelson;* and for State Supreme Court Justices by *Erik S. Jaffe.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, and *Manuel M. Medeiros,* State Solicitor, and by the Attorneys General for their respective States as follows: *Janet Napolitano* of Arizona, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *John Cornyn* of Texas, and *Christine O. Gregoire* of Washington; for the Ad hoc Committee of Former Justices and Friends Dedicated to an Independent Judiciary by *S. Shawn Stephens* and *Andy Taylor;* for the American Bar Association by *Robert E. Hirshon, Reagan Wm. Simpson,* and *Warren S. Huang;* for the Minnesota State Bar Association by *Wayne D. Struble;* for the Brennan Center for Justice at NYU School of Law et al. by *Scott Bales* and *Deborah Goldberg;* for the Conference of Chief Justices by *Roy A. Schotland, George T. Patton, Jr., Sarah Steele Riordan,* and *Robert F. Bauer;* for the Missouri Bar by *Joseph C. Blanton, Jr.;* and for Pennsylvanians for Modern Courts by *Edmund B. Spaeth, Jr.,* and *Brett G. Sweitzer.*

Briefs of *amici curiae* were filed for the Idaho Conservation League et al. by *John D. Echeverria;* and for the National Association of Criminal Defense Lawyers by *David W. Ogden, Jonathan J. Frankel, Neil M. Richards,* and *Lisa Kemler.*

JUSTICE SCALIA delivered the opinion of the Court.

The question presented in this case is whether the First Amendment permits the Minnesota Supreme Court to prohibit candidates for judicial election in that State from announcing their views on disputed legal and political issues.

I

Since Minnesota's admission to the Union in 1858, the State's Constitution has provided for the selection of all state judges by popular election. Minn. Const., Art. VI, § 7. Since 1912, those elections have been nonpartisan. Act of June 19, ch. 2, 1912 Minn. Laws Special Sess., pp. 4–6. Since 1974, they have been subject to a legal restriction which states that a "candidate for a judicial office, including an incumbent judge," shall not "announce his or her views on disputed legal or political issues." Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2000). This prohibition, promulgated by the Minnesota Supreme Court and based on Canon 7(B) of the 1972 American Bar Association (ABA) Model Code of Judicial Conduct, is known as the "announce clause." Incumbent judges who violate it are subject to discipline, including removal, censure, civil penalties, and suspension without pay. Minn. Rules of Board on Judicial Standards 4(a)(6), 11(d) (2002). Lawyers who run for judicial office also must comply with the announce clause. Minn. Rule of Professional Conduct 8.2(b) (2002) ("A lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct"). Those who violate it are subject to, *inter alia*, disbarment, suspension, and probation. Rule 8.4(a); Minn. Rules on Lawyers Professional Responsibility 8–14, 15(a) (2002).

In 1996, one of the petitioners, Gregory Wersal, ran for associate justice of the Minnesota Supreme Court. In the course of the campaign, he distributed literature criticizing several Minnesota Supreme Court decisions on issues such as crime, welfare, and abortion. A complaint against Wersal

challenging, among other things, the propriety of this litera-
ture was filed with the Office of Lawyers Professional Re-
sponsibility, the agency which, under the direction of the
Minnesota Lawyers Professional Responsibility Board,[1] in-
vestigates and prosecutes ethical violations of lawyer candi-
dates for judicial office. The Lawyers Board dismissed the
complaint; with regard to the charges that his campaign
materials violated the announce clause, it expressed doubt
whether the clause could constitutionally be enforced.
Nonetheless, fearing that further ethical complaints would
jeopardize his ability to practice law, Wersal withdrew from
the election. In 1998, Wersal ran again for the same office.
Early in that race, he sought an advisory opinion from the
Lawyers Board with regard to whether it planned to enforce
the announce clause. The Lawyers Board responded equiv-
ocally, stating that, although it had significant doubts about
the constitutionality of the provision, it was unable to answer
his question because he had not submitted a list of the an-
nouncements he wished to make.[2]

Shortly thereafter, Wersal filed this lawsuit in Federal
District Court against respondents,[3] seeking, *inter alia,* a

---

[1] The Eighth Circuit did not parse out the separate functions of these
two entities in the case at hand, referring to the two of them collectively
as the "Lawyers Board." We take the same approach.

[2] Nor did Wersal have any success receiving answers from the Lawyers
Board when he included "concrete examples," *post,* at 799, n. 2 (STEVENS,
J., dissenting), in his request for an advisory opinion on other subjects a
month later:

"As you are well aware, there is pending litigation over the constitution-
ality of certain portions of Canon 5. You are a plaintiff in this action and
you have sued, among others, me as Director of the Office of Lawyers
Professional Responsibility and Charles Lundberg as the Chair of the
Board of Lawyers Professional Responsibility. Due to this pending litiga-
tion, I will not be answering your request for an advisory opinion at this
time." App. 153.

[3] Respondents are officers of the Lawyers Board and of the Minnesota
Board on Judicial Standards (Judicial Board), which enforces the ethical
rules applicable to judges.

declaration that the announce clause violates the First Amendment and an injunction against its enforcement. Wersal alleged that he was forced to refrain from announcing his views on disputed issues during the 1998 campaign, to the point where he declined response to questions put to him by the press and public, out of concern that he might run afoul of the announce clause. Other plaintiffs in the suit, including the Minnesota Republican Party, alleged that, because the clause kept Wersal from announcing his views, they were unable to learn those views and support or oppose his candidacy accordingly. The parties filed cross-motions for summary judgment, and the District Court found in favor of respondents, holding that the announce clause did not violate the First Amendment. 63 F. Supp. 2d 967 (Minn. 1999). Over a dissent by Judge Beam, the United States Court of Appeals for the Eighth Circuit affirmed. *Republican Party of Minn.* v. *Kelly*, 247 F. 3d 854 (2001). We granted certiorari. 534 U. S. 1054 (2001).

## II

Before considering the constitutionality of the announce clause, we must be clear about its meaning. Its text says that a candidate for judicial office shall not "announce his or her views on disputed legal or political issues." Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2002).

We know that "announc[ing] . . . views" on an issue covers much more than *promising* to decide an issue a particular way. The prohibition extends to the candidate's mere statement of his current position, even if he does not bind himself to maintain that position after election. All the parties agree this is the case, because the Minnesota Code contains a so-called "pledges or promises" clause, which *separately* prohibits judicial candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office," *ibid.*—a prohibition that is not challenged here and on which we express no view.

There are, however, some limitations that the Minnesota Supreme Court has placed upon the scope of the announce clause that are not (to put it politely) immediately apparent from its text. The statements that formed the basis of the complaint against Wersal in 1996 included criticism of past decisions of the Minnesota Supreme Court. One piece of campaign literature stated that "[t]he Minnesota Supreme Court has issued decisions which are marked by their disregard for the Legislature and a lack of common sense." App. 37. It went on to criticize a decision excluding from evidence confessions by criminal defendants that were not tape-recorded, asking "[s]hould we conclude that because the Supreme Court does not trust police, it allows confessed criminals to go free?" *Ibid.* It criticized a decision striking down a state law restricting welfare benefits, asserting that "[i]t's the Legislature which should set our spending policies." *Ibid.* And it criticized a decision requiring public financing of abortions for poor women as "unprecedented" and a "pro-abortion stance." *Id.*, at 38. Although one would think that all of these statements touched on disputed legal or political issues, they did not (or at least do not now) fall within the scope of the announce clause. The Judicial Board issued an opinion stating that judicial candidates may criticize past decisions, and the Lawyers Board refused to discipline Wersal for the foregoing statements because, in part, it thought they did not violate the announce clause. The Eighth Circuit relied on the Judicial Board's opinion in upholding the announce clause, 247 F. 3d, at 882, and the Minnesota Supreme Court recently embraced the Eighth Circuit's interpretation, *In re Code of Judicial Conduct*, 639 N. W. 2d 55 (2002).

There are yet further limitations upon the apparent plain meaning of the announce clause: In light of the constitutional concerns, the District Court construed the clause to reach only disputed issues that are likely to come before the candidate if he is elected judge. 63 F. Supp. 2d, at 986. The

Eighth Circuit accepted this limiting interpretation by the District Court, and in addition construed the clause to allow general discussions of case law and judicial philosophy. 247 F. 3d, at 881–882. The Supreme Court of Minnesota adopted these interpretations as well when it ordered enforcement of the announce clause in accordance with the Eighth Circuit's opinion. *In re Code of Judicial Conduct, supra.*

It seems to us, however, that—like the text of the announce clause itself—these limitations upon the text of the announce clause are not all that they appear to be. First, respondents acknowledged at oral argument that statements critical of past judicial decisions are *not* permissible if the candidate also states that he is against *stare decisis.* Tr. of Oral Arg. 33–34.[4] Thus, candidates must choose between stating their views critical of past decisions and stating their views in opposition to *stare decisis.* Or, to look at it more concretely, they may state their view that prior decisions were erroneous only if they do not assert that they, if elected, have any power to eliminate erroneous decisions. Second, limiting the scope of the clause to issues likely to come before a court is not much of a limitation at all. One would hardly expect the "disputed legal or political issues" raised in the course of a state judicial election to include such matters as whether the Federal Government should end the embargo of Cuba. Quite obviously, they will be those legal or political disputes that are the proper (or by past decisions have been made the improper) business of the state courts. And within that relevant category, "[t]here is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction."

---

[4] JUSTICE GINSBURG argues that we should ignore this concession at oral argument because it is inconsistent with the Eighth Circuit's interpretation of the announce clause. *Post,* at 810 (dissenting opinion). As she appears to acknowledge, however, the Eighth Circuit was merely silent on this particular question. *Ibid.* Silence is hardly inconsistent with what respondents conceded at oral argument.

*Buckley* v. *Illinois Judicial Inquiry Bd.*, 997 F. 2d 224, 229 (CA7 1993). Third, construing the clause to allow "general" discussions of case law and judicial philosophy turns out to be of little help in an election campaign. At oral argument, respondents gave, as an example of this exception, that a candidate is free to assert that he is a " 'strict constructionist.' " Tr. of Oral Arg. 29. But that, like most other philosophical generalities, has little meaningful content for the electorate unless it is exemplified by application to a particular issue of construction likely to come before a court—for example, whether a particular statute runs afoul of any provision of the Constitution. Respondents conceded that the announce clause would prohibit the candidate from exemplifying his philosophy in this fashion. *Id.*, at 43. Without such application to real-life issues, all candidates can claim to be "strict constructionists" with equal (and unhelpful) plausibility.

In any event, it is clear that the announce clause prohibits a judicial candidate from stating his views on any specific nonfanciful legal question within the province of the court for which he is running, except in the context of discussing past decisions—and in the latter context as well, if he expresses the view that he is not bound by *stare decisis*.[5]

---

[5] In 1990, in response to concerns that its 1972 Model Canon—which was the basis for Minnesota's announce clause—violated the First Amendment, see L. Milord, The Development of the ABA Judicial Code 50 (1992), the ABA replaced that canon with a provision that prohibits a judicial candidate from making "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." ABA Model Code of Judicial Conduct, Canon 5(A)(3)(d)(ii) (2000). At oral argument, respondents argued that the limiting constructions placed upon Minnesota's announce clause by the Eighth Circuit, and adopted by the Minnesota Supreme Court, render the scope of the clause no broader than the ABA's 1990 canon. Tr. of Oral Arg. 38. This argument is somewhat curious because, based on the same constitutional concerns that had motivated the ABA, the Minnesota Supreme Court was urged to replace the announce clause with the new ABA language, but, unlike other jurisdictions, declined. Final Report of the Advi-

Respondents contend that this still leaves plenty of topics for discussion on the campaign trail. These include a candidate's "character," "education," "work habits," and "how [he] would handle administrative duties if elected." Brief for Respondents 35–36. Indeed, the Judicial Board has printed a list of preapproved questions which judicial candidates are allowed to answer. These include how the candidate feels about cameras in the courtroom, how he would go about reducing the caseload, how the costs of judicial administration can be reduced, and how he proposes to ensure that minorities and women are treated more fairly by the court system. Minnesota State Bar Association Judicial Elections Task Force Report & Recommendations, App. C (June 19, 1997), reprinted at App. 97–103. Whether this list of preapproved subjects, and other topics not prohibited by the announce clause, adequately fulfill the First Amendment's guarantee of freedom of speech is the question to which we now turn.

### III

As the Court of Appeals recognized, the announce clause both prohibits speech on the basis of its content and burdens a category of speech that is "at the core of our First Amendment freedoms"—speech about the qualifications of candidates for public office. 247 F. 3d, at 861, 863. The Court of Appeals concluded that the proper test to be applied to determine the constitutionality of such a restriction is what our cases have called strict scrutiny, *id.*, at 864; the parties do not dispute that this is correct. Under the strict-scrutiny test, respondents have the burden to prove that the an-

---

sory Committee to Review the ABA Model Code of Judicial Conduct and the Rules of the Minnesota Board on Judicial Standards 5–6 (June 29, 1994), reprinted at App. 367–368. The ABA, however, agrees with respondents' position, Brief for ABA as *Amicus Curiae* 5. We do not know whether the announce clause (as interpreted by state authorities) and the 1990 ABA canon are one and the same. No aspect of our constitutional analysis turns on this question.

nounce clause is (1) narrowly tailored, to serve (2) a compelling state interest. *E. g., Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 222 (1989). In order for respondents to show that the announce clause is narrowly tailored, they must demonstrate that it does not "unnecessarily circumscrib[e] protected expression." *Brown* v. *Hartlage*, 456 U. S. 45, 54 (1982).

The Court of Appeals concluded that respondents had established two interests as sufficiently compelling to justify the announce clause: preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary. 247 F. 3d, at 867. Respondents reassert these two interests before us, arguing that the first is compelling because it protects the due process rights of litigants, and that the second is compelling because it preserves public confidence in the judiciary.[6] Respondents are rather vague, however, about what they mean by "impartiality." Indeed, although the term is used throughout the Eighth Circuit's opinion, the briefs, the Minnesota Code of Judicial Conduct, and the ABA Codes of Judicial Conduct, none of these sources bothers to define it. Clarity on this point is essential before we can decide whether impartiality is indeed a compelling state interest, and, if so, whether the announce clause is narrowly tailored to achieve it.

### A

One meaning of "impartiality" in the judicial context—and of course its root meaning—is the lack of bias for or against either *party* to the proceeding. Impartiality in this sense

---

[6] Although the Eighth Circuit also referred to the compelling interest in an "independent" judiciary, 247 F. 3d, at 864–868, both it and respondents appear to use that term, as applied to the issues involved in this case, as interchangeable with "impartial." See *id.*, at 864 (describing a judge's independence as his "ability to apply the law neutrally"); Brief for Respondents 20, n. 4 ("[J]udicial impartiality is linked to judicial independence").

assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party. This is the traditional sense in which the term is used. See Webster's New International Dictionary 1247 (2d ed. 1950) (defining "impartial" as "[n]ot partial; esp., not favoring one more than another; treating all alike; unbiased; equitable; fair; just"). It is also the sense in which it is used in the cases cited by respondents and *amici* for the proposition that an impartial judge is essential to due process. *Tumey* v. *Ohio*, 273 U. S. 510, 523, 531–534 (1927) (judge violated due process by sitting in a case in which it would be in his financial interest to find against one of the parties); *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813, 822–825 (1986) (same); *Ward* v. *Monroeville*, 409 U. S. 57, 58–62 (1972) (same); *Johnson* v. *Mississippi*, 403 U. S. 212, 215–216 (1971) *(per curiam)* (judge violated due process by sitting in a case in which one of the parties was a previously successful litigant against him); *Bracy* v. *Gramley*, 520 U. S. 899, 905 (1997) (would violate due process if a judge was disposed to rule against defendants who did not bribe him in order to cover up the fact that he regularly ruled in favor of defendants who did bribe him); *In re Murchison*, 349 U. S. 133, 137–139 (1955) (judge violated due process by sitting in the criminal trial of defendant whom he had indicted).

We think it plain that the announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Indeed, the clause is barely tailored to serve that interest *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*. To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party.

*Any* party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.[7]

## B

It is perhaps possible to use the term "impartiality" in the judicial context (though this is certainly not a common usage) to mean lack of preconception in favor of or against a particular *legal view.* This sort of impartiality would be concerned, not with guaranteeing litigants equal application of the law, but rather with guaranteeing them an equal chance to persuade the court on the legal points in their case. Impartiality in this sense may well be an interest served by the announce clause, but it is not a *compelling* state interest, as strict scrutiny requires. A judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law. As then-JUSTICE REHNQUIST observed of our own Court: "Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions that would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had

---

[7] JUSTICE STEVENS asserts that the announce clause "serves the State's interest in maintaining both the appearance of this form of impartiality and its actuality." *Post,* at 801. We do not disagree. Some of the speech prohibited by the announce clause may well exhibit a bias against parties—including JUSTICE STEVENS's example of an election speech stressing the candidate's unbroken record of affirming convictions for rape, *ante,* at 800–801. That is why we are careful to say that the announce clause is *"barely* tailored to serve that interest," *supra,* at 776 (emphasis added). The question under our strict scrutiny test, however, is not whether the announce clause serves this interest *at all,* but whether it is *narrowly tailored* to serve this interest. It is not.

not at least given opinions as to constitutional issues in their previous legal careers." *Laird* v. *Tatum,* 409 U. S. 824, 835 (1972) (memorandum opinion). Indeed, even if it were possible to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so. "Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." *Ibid.* The Minnesota Constitution positively forbids the selection to courts of general jurisdiction of judges who are impartial in the sense of having no views on the law. Minn. Const., Art. VI, § 5 ("Judges of the supreme court, the court of appeals and the district court shall be learned in the law"). And since avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the "appearance" of that type of impartiality can hardly be a compelling state interest either.

## C

A third possible meaning of "impartiality" (again not a common one) might be described as openmindedness. This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case. This sort of impartiality seeks to guarantee each litigant, not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so. It may well be that impartiality in this sense, and the appearance of it, are desirable in the judiciary, but we need not pursue that inquiry, since we do not believe the Minnesota Supreme Court adopted the announce clause for that purpose.

Respondents argue that the announce clause serves the interest in openmindedness, or at least in the appearance of openmindedness, because it relieves a judge from pressure to rule a certain way in order to maintain consistency with

statements the judge has previously made. The problem is, however, that statements in election campaigns are such an infinitesimal portion of the public commitments to legal positions that judges (or judges-to-be) undertake, that this object of the prohibition is implausible. Before they arrive on the bench (whether by election or otherwise) judges have often committed themselves on legal issues that they must later rule upon. See, *e. g.*, *Laird, supra,* at 831–833 (describing Justice Black's participation in several cases construing and deciding the constitutionality of the Fair Labor Standards Act, even though as a Senator he had been one of its principal authors; and Chief Justice Hughes's authorship of the opinion overruling *Adkins* v. *Children's Hospital of D. C.,* 261 U. S. 525 (1923), a case he had criticized in a book written before his appointment to the Court). More common still is a judge's confronting a legal issue on which he has expressed an opinion while on the bench. Most frequently, of course, that prior expression will have occurred in ruling on an earlier case. But judges often state their views on disputed legal issues outside the context of adjudication—in classes that they conduct, and in books and speeches. Like the ABA Codes of Judicial Conduct, the Minnesota Code not only permits but encourages this. See Minn. Code of Judicial Conduct, Canon 4(B) (2002) ("A judge may write, lecture, teach, speak and participate in other extra-judicial activities concerning the law . . ."); Minn. Code of Judicial Conduct, Canon 4(B), Comment. (2002) ("To the extent that time permits, a judge is encouraged to do so . . ."). That is quite incompatible with the notion that the need for openmindedness (or for the appearance of openmindedness) lies behind the prohibition at issue here.

The short of the matter is this: In Minnesota, a candidate for judicial office may not say "I think it is constitutional for the legislature to prohibit same-sex marriages." He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeat-

edly (until litigation is pending) after he is elected. As a means of pursuing the objective of openmindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous. See *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52–53 (1994) (noting that underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech"); *Florida Star* v. *B. J. F.*, 491 U. S. 524, 541–542 (1989) (SCALIA, J., concurring in judgment) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited" (internal quotation marks and citation omitted)).

JUSTICE STEVENS asserts that statements made in an election campaign pose a special threat to openmindedness because the candidate, when elected judge, will have a *particular* reluctance to contradict them. *Post*, at 801. That might be plausible, perhaps, with regard to campaign *promises*. A candidate who says "If elected, I will vote to uphold the legislature's power to prohibit same-sex marriages" will positively be breaking his word if he does not do so (although one would be naive not to recognize that campaign promises are—by long democratic tradition—the least binding form of human commitment). But, as noted earlier, the Minnesota Supreme Court has adopted a separate prohibition on campaign "pledges or promises," which is not challenged here. The proposition that judges feel significantly greater compulsion, or appear to feel significantly greater compulsion, to maintain consistency with *nonpromissory* statements made during a judicial campaign than with such statements made before or after the campaign is not self-evidently true. It seems to us quite likely, in fact, that in many cases the opposite is true. We doubt, for example, that a mere statement of position enunciated during the pendency of an election will be regarded by a judge as more binding—or as more likely

to subject him to popular disfavor if reconsidered—than a carefully considered holding that the judge set forth in an earlier opinion denying some individual's claim to justice. In any event, it suffices to say that respondents have not carried the burden imposed by our strict-scrutiny test to establish this proposition (that campaign statements are uniquely destructive of openmindedness) on which the validity of the announce clause rests. See, e. g., Landmark Communications, Inc. v. Virginia, 435 U. S. 829, 841 (1978) (rejecting speech restriction subject to strict scrutiny where the State "offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined"); United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 816–825 (2000) (same).[8]

Moreover, the notion that the special context of electioneering justifies an *abridgment* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. "[D]ebate on the qualifications of candidates" is "at the core of our electoral process and of the First Amendment freedoms," not at the edges. Eu, 489 U. S., at 222–223 (internal quotation marks omitted). "The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters

---

[8] We do not agree with JUSTICE STEVENS's broad assertion that "to the extent that [statements on legal issues] seek to enhance the popularity of the candidate by indicating how he would rule in specific cases if elected, they evidence *a lack of fitness for office.*" Post, at 798 (emphasis added). Of course *all* statements on real-world legal issues "indicate" how the speaker would rule "in specific cases." And if making such statements *(of honestly held views)* with the hope of enhancing one's chances with the electorate displayed a lack of fitness for office, so would similarly motivated honest statements of judicial candidates made with the hope of enhancing their chances of confirmation by the Senate, or indeed of appointment by the President. Since such statements are made, we think, in every confirmation hearing, JUSTICE STEVENS must contemplate a federal bench filled with the unfit.

of current public importance." *Wood* v. *Georgia*, 370 U. S. 375, 395 (1962). "It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign." *Brown*, 456 U. S., at 60 (internal quotation marks and citation omitted). We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

JUSTICE GINSBURG would do so—and much of her dissent confirms rather than refutes our conclusion that the purpose behind the announce clause is not openmindedness in the judiciary, but the undermining of judicial elections. She contends that the announce clause must be constitutional because due process would be denied if an elected judge sat in a case involving an issue on which he had previously announced his view. *Post*, at 816, 819. She reaches this conclusion because, she says, such a judge would have a "direct, personal, substantial, and pecuniary interest" in ruling consistently with his previously announced view, in order to reduce the risk that he will be "voted off the bench and thereby lose [his] salary and emoluments," *post*, at 816 (internal quotation marks and alterations omitted). But elected judges—regardless of whether they have announced any views beforehand—*always* face the pressure of an electorate who might disagree with their rulings and therefore vote them off the bench. Surely the judge who frees Timothy McVeigh places his job much more at risk than the judge who (horror of horrors!) reconsiders his previously announced view on a disputed legal issue. So if, as JUSTICE GINSBURG claims, it violates due process for a judge to sit in a case in which ruling one way rather than another increases his prospects for reelection, then—quite simply—the practice of electing judges is itself a violation of due process. It is not difficult to understand how one with these views would approve the election-nullifying effect of the announce

clause.[9] They are not, however, the views reflected in the Due Process Clause of the Fourteenth Amendment, which has coexisted with the election of judges ever since it was adopted, see *infra*, at 785–786.

JUSTICE GINSBURG devotes the rest of her dissent to attacking arguments we do not make. For example, despite the number of pages she dedicates to disproving this proposition, *post*, at 805–809, we neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office.[10] What we do assert, and what JUSTICE GINSBURG ignores, is that, *even if* the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns, the announce clause still fails strict scrutiny because it is woefully underinclusive, prohibiting announcements by judges (and would-be judges) only at certain times and in certain forms. We rely on the cases involving speech during elections, *supra*, at 781–782, only to make the obvious point that this underinclusiveness cannot be explained by resort to the notion that the First Amendment provides less protection during an election campaign than at other times.[11]

---

[9] JUSTICE GINSBURG argues that the announce clause is not election nullifying because Wersal criticized past decisions of the Minnesota Supreme Court in his campaign literature and the Lawyers Board decided not to discipline him for doing so. *Post*, at 811–812. As we have explained, however, had Wersal additionally stated during his campaign that he did not feel bound to follow those erroneous decisions, he would not have been so lucky. *Supra*, at 772–773. This predicament hardly reflects "the robust communication of ideas and views from judicial candidate to voter." *Post*, at 812.

[10] JUSTICE STEVENS devotes most of his dissent to this same argument that we do not make.

[11] Nor do we assert that candidates for judicial office should be *compelled* to announce their views on disputed legal issues. Thus, JUSTICE GINSBURG's repeated invocation of instances in which nominees to this Court declined to announce such views during Senate confirmation hearings is pointless. *Post*, at 807–808, n. 1, 818–819, n. 4. That the practice

But in any case, JUSTICE GINSBURG greatly exaggerates the difference between judicial and legislative elections. She asserts that "the rationale underlying unconstrained speech in elections for political office—that representative government depends on the public's ability to choose agents who will act at its behest—does not carry over to campaigns for the bench." *Post,* at 806. This complete separation of the judiciary from the enterprise of "representative government" might have some truth in those countries where judges neither make law themselves nor set aside the laws enacted by the legislature. It is not a true picture of the American system. Not only do state-court judges possess the power to "make" common law, but they have the immense power to shape the States' constitutions as well. See, *e. g., Baker* v. *State,* 170 Vt. 194, 744 A. 2d 864 (1999). Which is precisely why the election of state judges became popular.[12]

---

of *voluntarily* demurring does not establish the legitimacy of *legal compulsion* to demur is amply demonstrated by the unredacted text of the sentence she quotes in part, *post,* at 819, from *Laird* v. *Tatum,* 409 U. S. 824, 836, n. 5 (1972): "*In terms of propriety, rather than disqualification,* I would distinguish quite sharply between a public statement made prior to nomination for the bench, on the one hand, and a public statement made by a nominee to the bench." (Emphasis added.)

[12] Although JUSTICE STEVENS at times appears to agree with JUSTICE GINSBURG's premise that the judiciary is completely separated from the enterprise of representative government, *post,* at 798 ("[E]very good judge is fully aware of the distinction between the law and a personal point of view"), he eventually appears to concede that the separation does not hold true for many judges who sit on courts of last resort, *ante,* at 799 ("If he is not a judge on the highest court in the State, he has an obligation to follow the precedent of that court, not his personal views or public opinion polls"); *post,* at 799, n. 2. Even if the policymaking capacity of judges were limited to courts of last resort, that would only prove that the announce clause fails strict scrutiny. "[I]f announcing one's views in the context of a campaign for the State Supreme Court might be" protected speech, *ibid.,* then—even if announcing one's views in the context of a campaign for a lower court were *not* protected speech, *ibid.*—the announce clause would not be narrowly tailored, since it applies to high-

## IV

To sustain the announce clause, the Eighth Circuit relied heavily on the fact that a pervasive practice of prohibiting judicial candidates from discussing disputed legal and political issues developed during the last half of the 20th century. 247 F. 3d, at 879–880. It is true that a "universal and long-established" tradition of prohibiting certain conduct creates "a strong presumption" that the prohibition is constitutional: "Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 375–377 (1995) (SCALIA, J., dissenting). The practice of prohibiting speech by judicial candidates on disputed issues, however, is neither long nor universal.

At the time of the founding, only Vermont (before it became a State) selected any of its judges by election. Starting with Georgia in 1812, States began to provide for judicial election, a development rapidly accelerated by Jacksonian democracy. By the time of the Civil War, the great majority of States elected their judges. E. Haynes, Selection and Tenure of Judges 99–135 (1944); Berkson, Judicial Selection in the United States: A Special Report, 64 Judicature 176 (1980). We know of no restrictions upon statements that could be made by, judicial candidates (including judges) throughout the 19th and the first quarter of the 20th century. Indeed, judicial elections were generally partisan during this period, the movement toward nonpartisan judicial elections not even beginning until the 1870's. *Id.*, at 176–177;

---

and low-court candidates alike. In fact, however, the judges of inferior courts *often* "make law," since the precedent of the highest court does not cover every situation, and not every case is reviewed. JUSTICE STEVENS has repeatedly expressed the view that a settled course of lower court opinions binds the highest court. See, *e. g.*, *Reves* v. *Ernst & Young*, 494 U. S. 56, 74 (1990) (concurring opinion); *McNally* v. *United States*, 483 U. S. 350, 376–377 (1987) (dissenting opinion).

M. Comisky & P. Patterson, The Judiciary—Selection, Compensation, Ethics, and Discipline 4, 7 (1987). Thus, not only were judicial candidates (including judges) discussing disputed legal and political issues on the campaign trail, but they were touting party affiliations and angling for party nominations all the while.

The first code regulating judicial conduct was adopted by the ABA in 1924. 48 ABA Reports 74 (1923) (report of Chief Justice Taft); P. McFadden, Electing Justice: The Law and Ethics of Judicial Election Campaigns 86 (1990). It contained a provision akin to the announce clause: "A candidate for judicial position . . . should not announce in advance his conclusions of law on disputed issues to secure class support . . . ." ABA Canon of Judicial Ethics 30 (1924). The States were slow to adopt the canons, however. "By the end of World War II, the canons . . . were binding by the bar associations or supreme courts of only eleven states." J. MacKenzie, The Appearance of Justice 191 (1974). Even today, although a majority of States have adopted either the announce clause or its 1990 ABA successor, adoption is not unanimous. Of the 31 States that select some or all of their appellate and general-jurisdiction judges by election, see American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (Apr. 2002), 4 have adopted no candidate-speech restriction comparable to the announce clause,[13] and 1 prohibits only the discussion of "pending litigation."[14] This practice, relatively new to judicial elections and still not universally adopted, does not compare well with the traditions deemed worthy of our attention in prior cases. *E. g., Burson* v. *Freeman,* 504 U. S. 191, 205–206 (1992) (crediting tradition of prohibiting speech around

---

[13] Idaho Code of Judicial Conduct, Canon 7 (2001); Mich. Code of Judicial Conduct, Canon 7 (2002); N. C. Code of Judicial Conduct, Canon 7 (2001); Ore. Code of Judicial Conduct, Rule 4–102 (2002). All of these States save Idaho have adopted the pledges or promises clause.

[14] Ala. Canon of Judicial Ethics 7(B)(1)(c) (2002).

polling places that began with the very adoption of the secret ballot in the late 19th century, and in which every State participated); *id.*, at 214–216 (SCALIA, J., concurring in judgment) (same); *McIntyre, supra,* at 375–377 (SCALIA, J., dissenting) (crediting tradition of prohibiting anonymous election literature, which again began in 1890 and was universally adopted).

*    *    *

There is an obvious tension between the article of Minnesota's popularly approved Constitution which provides that judges shall be elected, and the Minnesota Supreme Court's announce clause which places most subjects of interest to the voters off limits. (The candidate-speech restrictions of all the other States that have them are also the product of judicial fiat.[15]) The disparity is perhaps unsurprising, since the ABA, which originated the announce clause, has long been an opponent of judicial elections. See ABA Model Code of Judicial Conduct, Canon 5(C)(2), Comment (2000) ("[M]erit selection of judges is a preferable manner in which to select the judiciary"); An Independent Judiciary: Report of the ABA Commission on Separation of Powers and Judicial Independence 96 (1997) ("The American Bar Association strongly endorses the merit selection of judges, as opposed to their election .... Five times between August 1972 and August 1984 the House of Delegates has approved recommendations stating the preference for merit selection and encouraging bar associations in jurisdictions where judges are elected ... to work for the adoption of merit selection and retention"). That opposition may be well taken (it certainly had the sup-

---

[15] These restrictions are all contained in these States' codes of judicial conduct, App. to Brief for ABA as *Amicus Curiae.* "In every state, the highest court promulgates the Code of Judicial Conduct, either by express constitutional provision, statutory authorization, broad constitutional grant, or inherent power." In the Supreme Court of Texas: Per Curiam Opinion Concerning Amendments to Canons 5 and 6 of the Code of Judicial Conduct, 61 Tex. B. J. 64, 66 (1998) (collecting provisions).

port of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about. "[T]he greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *Renne* v. *Geary,* 501 U. S. 312, 349 (1991) (Marshall, J., dissenting); accord, *Meyer* v. *Grant,* 486 U. S. 414, 424–425 (1988) (rejecting argument that the greater power to end voter initiatives includes the lesser power to prohibit paid petition-circulators).

The Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment. Accordingly, we reverse the grant of summary judgment to respondents and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I join the opinion of the Court but write separately to express my concerns about judicial elections generally. Respondents claim that "[t]he Announce Clause is necessary . . . to protect the State's compelling governmental interes[t] in an actual and perceived . . . impartial judiciary." Brief for Respondents 8. I am concerned that, even aside from what judicial candidates may say while campaigning, the very practice of electing judges undermines this interest.

We of course want judges to be impartial, in the sense of being free from any personal stake in the outcome of the cases to which they are assigned. But if judges are subject to regular elections they are likely to feel that they have at

least some personal stake in the outcome of every publicized case. Elected judges cannot help being aware that if the public is not satisfied with the outcome of a particular case, it could hurt their reelection prospects. See Eule, Crocodiles in the Bathtub: State Courts, Voter Initiatives and the Threat of Electoral Reprisal, 65 U. Colo. L. Rev. 733, 739 (1994) (quoting former California Supreme Court Justice Otto Kaus' statement that ignoring the political consequences of visible decisions is " 'like ignoring a crocodile in your bathtub' "); Bright & Keenan, Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases, 75 B. U. L. Rev. 759, 793–794 (1995) (citing statistics indicating that judges who face elections are far more likely to override jury sentences of life without parole and impose the death penalty than are judges who do not run for election). Even if judges were able to suppress their awareness of the potential electoral consequences of their decisions and refrain from acting on it, the public's confidence in the judiciary could be undermined simply by the possibility that judges would be unable to do so.

Moreover, contested elections generally entail campaigning. And campaigning for a judicial post today can require substantial funds. See Schotland, Financing Judicial Elections, 2000: Change and Challenge, 2001 L. Rev. Mich. State U. Detroit College of Law 849, 866 (reporting that in 2000, the 13 candidates in a partisan election for 5 seats on the Alabama Supreme Court spent an average of $1,092,076 on their campaigns); American Bar Association, Report and Recommendations of the Task Force on Lawyers' Political Contributions, pt. 2 (July 1998) (reporting that in 1995, one candidate for the Pennsylvania Supreme Court raised $1,848,142 in campaign funds, and that in 1986, $2,700,000 was spent on the race for Chief Justice of the Ohio Supreme Court). Unless the pool of judicial candidates is limited to those wealthy enough to independently fund their campaigns, a limitation unrelated to judicial skill, the cost of

campaigning requires judicial candidates to engage in fundraising. Yet relying on campaign donations may leave judges feeling indebted to certain parties or interest groups. See Thomas, National L. J., Mar. 16, 1998, p. A8, col. 1 (reporting that a study by the public interest group Texans for Public Justice found that 40 percent of the $9,200,000 in contributions of $100 or more raised by seven of Texas' nine Supreme Court justices for their 1994 and 1996 elections "came from parties and lawyers with cases before the court or contributors closely linked to these parties"). Even if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributors is likely to undermine the public's confidence in the judiciary. See Greenberg Quinlan Rosner Research, Inc., and American Viewpoint, National Public Opinion Survey Frequency Questionnaire 4 (2001) (available at http://www.justiceatstake. org/files/JASNationalSurveyResults.pdf) (describing survey results indicating that 76 percent of registered voters believe that campaign contributions influence judicial decisions); *id.*, at 7 (describing survey results indicating that two-thirds of registered voters believe individuals and groups who give money to judicial candidates often receive favorable treatment); Barnhizer, "On the Make": Campaign Funding and the Corrupting of the American Judiciary, 50 Cath. U. L. Rev. 361, 379 (2001) (relating anecdotes of lawyers who felt that their contributions to judicial campaigns affected their chance of success in court).

Despite these significant problems, 39 States currently employ some form of judicial elections for their appellate courts, general jurisdiction trial courts, or both. American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (Apr. 2002). Judicial elections were not always so prevalent. The first 29 States of the Union adopted methods for selecting judges that did not involve popular elections. See Croley, The Majoritarian Dif-

ficulty: Elective Judiciaries and the Rule of Law, 62 U. Chi. L. Rev. 689, 716 (1995). As the Court explains, however, beginning with Georgia in 1812, States began adopting systems for judicial elections. See *ante*, at 785. From the 1830's until the 1850's, as part of the Jacksonian movement toward greater popular control of public office, this trend accelerated, see Goldschmidt, Merit Selection: Current Status, Procedures, and Issues, 49 U. Miami L. Rev. 1, 5 (1994), and by the Civil War, 22 of the 34 States elected their judges, *ibid.* By the beginning of the 20th century, however, elected judiciaries increasingly came to be viewed as incompetent and corrupt, and criticism of partisan judicial elections mounted. Croley, *supra*, at 723. In 1906, Roscoe Pound gave a speech to the American Bar Association in which he claimed that "compelling judges to become politicians, in many jurisdictions has almost destroyed the traditional respect for the bench." The Causes of Popular Dissatisfaction with the Administration of Justice, 8 Baylor L. Rev. 1, 23 (1956) (reprinting Pound's speech).

In response to such concerns, some States adopted a modified system of judicial selection that became known as the Missouri Plan (because Missouri was the first State to adopt it for most of its judicial posts). See Croley, 62 U. Chi. L. Rev., at 724. Under the Missouri Plan, judges are appointed by a high elected official, generally from a list of nominees put together by a nonpartisan nominating commission, and then subsequently stand for unopposed retention elections in which voters are asked whether the judges should be recalled. *Ibid.* If a judge is recalled, the vacancy is filled through a new nomination and appointment. *Ibid.* This system obviously reduces threats to judicial impartiality, even if it does not eliminate all popular pressure on judges. See Grodin, Developing a Consensus of Constraint: A Judge's Perspective on Judicial Retention Elections, 61 S. Cal. L. Rev. 1969, 1980 (1988) (admitting that he cannot be sure that his votes as a California Supreme Court Justice

in "critical cases" during 1986 were not influenced subconsciously by his awareness that the outcomes could affect his chances in the retention elections being conducted that year). The Missouri Plan is currently used to fill at least some judicial offices in 15 States. Croley, *supra*, at 725–726; American Judicature Society, *supra*.

Thirty-one States, however, still use popular elections to select some or all of their appellate and/or general jurisdiction trial court judges, who thereafter run for reelection periodically. *Ibid.* Of these, slightly more than half use nonpartisan elections, and the rest use partisan elections. *Ibid.* Most of the States that do not have any form of judicial elections choose judges through executive nomination and legislative confirmation. See Croley, *supra*, at 725.

Minnesota has chosen to select its judges through contested popular elections instead of through an appointment system or a combined appointment and retention election system along the lines of the Missouri Plan. In doing so the State has voluntarily taken on the risks to judicial bias described above. As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

JUSTICE KENNEDY, concurring.

I agree with the Court that Minnesota's prohibition on judicial candidates' announcing their legal views is an unconstitutional abridgment of the freedom of speech. There is authority for the Court to apply strict scrutiny analysis to resolve some First Amendment cases, see, *e. g., Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105 (1991), and the Court explains in clear and forceful terms why the Minnesota regulatory scheme fails that test. So I join its opinion.

I adhere to my view, however, that content-based speech restrictions that do not fall within any traditional exception should be invalidated without inquiry into narrow tailoring or compelling government interests. The speech at issue here does not come within any of the exceptions to the First Amendment recognized by the Court. "Here, a law is directed to speech alone where the speech in question is not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, and not calculated or likely to bring about imminent harm the State has the substantive power to prevent. No further inquiry is necessary to reject the State's argument that the statute should be upheld." *Id.*, at 124 (KENNEDY, J., concurring in judgment). The political speech of candidates is at the heart of the First Amendment, and direct restrictions on the content of candidate speech are simply beyond the power of government to impose.

Here, Minnesota has sought to justify its speech restriction as one necessary to maintain the integrity of its judiciary. Nothing in the Court's opinion should be read to cast doubt on the vital importance of this state interest. Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.

Articulated standards of judicial conduct may advance this interest. See Shepard, Campaign Speech: Restraint and Liberty in Judicial Ethics, 9 Geo. J. Legal Ethics 1059 (1996). To comprehend, then to codify, the essence of judicial integrity is a hard task, however. "The work of deciding cases goes on every day in hundreds of courts throughout the land. Any judge, one might suppose, would find it easy to describe

the process which he had followed a thousand times and more. Nothing could be farther from the truth." B. Cardozo, The Nature of the Judicial Process 9 (1921). Much the same can be said of explicit standards to ensure judicial integrity. To strive for judicial integrity is the work of a lifetime. That should not dissuade the profession. The difficulty of the undertaking does not mean we should refrain from the attempt. Explicit standards of judicial conduct provide essential guidance for judges in the proper discharge of their duties and the honorable conduct of their office. The legislative bodies, judicial committees, and professional associations that promulgate those standards perform a vital public service. See, *e. g.,* Administrative Office of U. S. Courts, Code of Judicial Conduct for United States Judges (1999). Yet these standards may not be used by the State to abridge the speech of aspiring judges in a judicial campaign.

Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censure judges who violate these standards. What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State. See *Brown* v. *Hartlage,* 456 U. S. 45, 60 (1982). The law in question here contradicts the principle that unabridged speech is the foundation of political freedom.

The State of Minnesota no doubt was concerned, as many citizens and thoughtful commentators are concerned, that judicial campaigns in an age of frenetic fundraising and mass media may foster disrespect for the legal system. Indeed, from the beginning there have been those who believed that the rough-and-tumble of politics would bring our governmental institutions into ill repute. And some have sought to

cure this tendency with governmental restrictions on political speech. See Sedition Act of 1798, ch. 74, 1 Stat. 596. Cooler heads have always recognized, however, that these measures abridge the freedom of speech—not because the state interest is insufficiently compelling, but simply because content-based restrictions on political speech are " 'expressly and positively forbidden by' " the First Amendment. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 274 (1964) (quoting the Virginia Resolutions of 1798). The State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgment of speech.

If Minnesota believes that certain sorts of candidate speech disclose flaws in the candidate's credentials, democracy and free speech are their own correctives. The legal profession, the legal academy, the press, voluntary groups, political and civic leaders, and all interested citizens can use their own First Amendment freedoms to protest statements inconsistent with standards of judicial neutrality and judicial excellence. Indeed, if democracy is to fulfill its promise, they must do so. They must reach voters who are uninterested or uninformed or blinded by partisanship, and they must urge upon the voters a higher and better understanding of the judicial function and a stronger commitment to preserving its finest traditions. Free elections and free speech are a powerful combination: Together they may advance our understanding of the rule of law and further a commitment to its precepts.

There is general consensus that the design of the Federal Constitution, including lifetime tenure and appointment by nomination and confirmation, has preserved the independence of the Federal Judiciary. In resolving this case, however, we should refrain from criticism of the State's choice to use open elections to select those persons most likely to achieve judicial excellence. States are free to choose this mechanism rather than, say, appointment and confirmation.

By condemning judicial elections across the board, we implicitly condemn countless elected state judges and without warrant. Many of them, despite the difficulties imposed by the election system, have discovered in the law the enlightenment, instruction, and inspiration that make them independent-minded and faithful jurists of real integrity. We should not, even by inadvertence, "impute to judges a lack of firmness, wisdom, or honor." *Bridges* v. *California*, 314 U. S. 252, 273 (1941).

These considerations serve but to reinforce the conclusion that Minnesota's regulatory scheme is flawed. By abridging speech based on its content, Minnesota impeaches its own system of free and open elections. The State may not regulate the content of candidate speech merely because the speakers are candidates. This case does not present the question whether a State may restrict the speech of judges because they are judges—for example, as part of a code of judicial conduct; the law at issue here regulates judges only when and because they are candidates. Whether the rationale of *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968), and *Connick* v. *Myers*, 461 U. S. 138 (1983), could be extended to allow a general speech restriction on sitting judges—regardless of whether they are campaigning—in order to promote the efficient administration of justice, is not an issue raised here.

Petitioner Gregory Wersal was not a sitting judge but a challenger; he had not voluntarily entered into an employment relationship with the State or surrendered any First Amendment rights. His speech may not be controlled or abridged in this manner. Even the undoubted interest of the State in the excellence of its judiciary does not allow it to restrain candidate speech by reason of its content. Minnesota's attempt to regulate campaign speech is impermissible.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In her dissenting opinion, JUSTICE GINSBURG has cogently explained why the Court's holding is unsound. I therefore join her opinion without reservation. I add these comments to emphasize the force of her arguments and to explain why I find the Court's reasoning even more troubling than its holding. The limits of the Court's holding are evident: Even if the Minnesota Lawyers Professional Responsibility Board (Board) may not sanction a judicial candidate for announcing his views on issues likely to come before him, it may surely advise the electorate that such announcements demonstrate the speaker's unfitness for judicial office. If the solution to harmful speech must be more speech, so be it. The Court's reasoning, however, will unfortunately endure beyond the next election cycle. By obscuring the fundamental distinction between campaigns for the judiciary and the political branches, and by failing to recognize the difference between statements made in articles or opinions and those made on the campaign trail, the Court defies any sensible notion of the judicial office and the importance of impartiality in that context.

The Court's disposition rests on two seriously flawed premises—an inaccurate appraisal of the importance of judicial independence and impartiality, and an assumption that judicial candidates should have the same freedom "'to express themselves on matters of current public importance'" as do all other elected officials. *Ante*, at 781–782. Elected judges, no less than appointed judges, occupy an office of trust that is fundamentally different from that occupied by policymaking officials. Although the fact that they must stand for election makes their job more difficult than that of the tenured judge, that fact does not lessen their duty to respect essential attributes of the judicial office that have been embedded in Anglo-American law for centuries.

There is a critical difference between the work of the judge and the work of other public officials. In a democracy, issues of policy are properly decided by majority vote; it is the business of legislators and executives to be popular. But in litigation, issues of law or fact should not be determined by popular vote; it is the business of judges to be indifferent to unpopularity. Sir Matthew Hale pointedly described this essential attribute of the judicial office in words which have retained their integrity for centuries:

> " '11. That popular or court applause or distaste have no influence in anything I do, in point of distribution of justice.
>
> " '12. Not to be solicitous what men will say or think, so long as I keep myself exactly according to the rule of justice.' "[1]

Consistent with that fundamental attribute of the office, countless judges in countless cases routinely make rulings that are unpopular and surely disliked by at least 50 percent of the litigants who appear before them. It is equally common for them to enforce rules that they think unwise, or that are contrary to their personal predilections. For this reason, opinions that a lawyer may have expressed before becoming a judge, or a judicial candidate, do not disqualify anyone for judicial service because every good judge is fully aware of the distinction between the law and a personal point of view. It is equally clear, however, that such expressions after a lawyer has been nominated to judicial office shed little, if any, light on his capacity for judicial service. Indeed, to the extent that such statements seek to enhance the popularity of the candidate by indicating how he would rule in specific cases if elected, they evidence a lack of fitness for the office.

---

[1] 2 J. Campbell, Lives of the Chief Justices of England 208 (1873) (quoting Hale's Rules For His Judicial Guidance, Things Necessary to be Continually Had in Remembrance).

Of course, any judge who faces reelection may believe that he retains his office only so long as his decisions are popular. Nevertheless, the elected judge, like the lifetime appointee, does not serve a constituency while holding that office. He has a duty to uphold the law and to follow the dictates of the Constitution. If he is not a judge on the highest court in the State, he has an obligation to follow the precedent of that court, not his personal views or public opinion polls.[2] He may make common law, but judged on the merits of individual cases, not as a mandate from the voters.

By recognizing a conflict between the demands of electoral politics and the distinct characteristics of the judiciary, we

---

[2] The Court largely ignores the fact that judicial elections are not limited to races for the highest court in the State. Even if announcing one's views in the context of a campaign for the State Supreme Court might be permissible, the same statements are surely less appropriate when one is running for an intermediate or trial court judgeship. Such statements not only display a misunderstanding of the judicial role, but also mislead the voters by giving them the false impression that a candidate for the trial court will be able to and should decide cases based on his personal views rather than precedent.

Indeed, the Court's entire analysis has a hypothetical quality to it that stems, in part, from the fact that no candidate has yet been sanctioned for violating the announce clause. The one complaint filed against petitioner Gregory Wersal for campaign materials during his 1996 election run was dismissed by the Board. App. 16–21. Moreover, when Wersal sought an advisory opinion during his 1998 campaign, the Board could not evaluate his request because he had "not specified what statement [he] would make that may or may not be a view on a disputed, legal or political issue." *Id.*, at 32. Since Wersal failed to provide examples of statements he wished to make, and because the Board had its own doubts about the constitutionality of the announce clause, it advised Wersal that "unless the speech at issue violates other prohibitions listed in Canon 5 or other portions of the Code of Judicial Conduct, it is our belief that this section is not, as written, constitutionally enforceable." *Ibid.* Consequently, the Court is left to decide a question of great constitutional importance in a case in which either the petitioner's statements were not subject to the prohibition in question, or he neglected to supply any concrete examples of statements he wished to make, and the Board refused to enforce the prohibition because of its own constitutional concerns.

do not have to put States to an all or nothing choice of abandoning judicial elections or having elections in which anything goes. As a practical matter, we cannot know for sure whether an elected judge's decisions are based on his interpretation of the law or political expediency. In the absence of reliable evidence one way or the other, a State may reasonably presume that elected judges are motivated by the highest aspirations of their office. But we do know that a judicial candidate, who announces his views in the context of a campaign, is effectively telling the electorate: "Vote for me because I believe X, and I will judge cases accordingly." Once elected, he may feel free to disregard his campaign statements, *ante*, at 780–781, but that does not change the fact that the judge announced his position on an issue likely to come before him *as a reason to vote for him*. Minnesota has a compelling interest in sanctioning such statements.

A candidate for judicial office who goes beyond the expression of "general observation about the law . . . in order to obtain favorable consideration" of his candidacy, *Laird* v. *Tatum*, 409 U. S. 824, 836, n. 5 (1972) (memorandum of REHNQUIST, J., on motion for recusal), demonstrates either a lack of impartiality or a lack of understanding of the importance of maintaining public confidence in the impartiality of the judiciary. It is only by failing to recognize the distinction, clearly stated by then-JUSTICE REHNQUIST, between statements made during a campaign or confirmation hearing and those made before announcing one's candidacy, that the Court is able to conclude: "[S]ince avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either," *ante*, at 778.

Even when "impartiality" is defined in its narrowest sense to embrace only "the lack of bias for or against either *party* to the proceeding," *ante*, at 775, the announce clause serves that interest. Expressions that stress a candidate's unbro-

ken record of affirming convictions for rape,[3] for example, imply a bias in favor of a particular litigant (the prosecutor) and against a class of litigants (defendants in rape cases). Contrary to the Court's reasoning in its first attempt to define impartiality, *ante,* at 775–776, an interpretation of the announce clause that prohibits such statements serves the State's interest in maintaining both the appearance of this form of impartiality and its actuality.

When the Court evaluates the importance of impartiality in its broadest sense, which it describes as "the interest in openmindedness, or at least in the appearance of openmindedness," *ante,* at 778, it concludes that the announce clause is "so woefully underinclusive as to render belief in that purpose a challenge to the credulous," *ante,* at 780. It is underinclusive, in the Court's view, because campaign statements are an infinitesimal portion of the public commitments to legal positions that candidates make during their professional careers. It is not, however, the number of legal views that a candidate may have formed or discussed in his prior career that is significant. Rather, it is the ability both to reevaluate them in the light of an adversarial presentation, and to apply the governing rule of law even when inconsistent with those views, that characterize judicial openmindedness.

The Court boldly asserts that respondents have failed to carry their burden of demonstrating "that campaign statements are uniquely destructive of openmindedness," *ante,* at 781. But the very purpose of most statements prohibited by the announce clause is to convey the message that the candidate's mind is not open on a particular issue. The lawyer who writes an article advocating harsher penalties for polluters surely does not commit to that position to the same degree as the candidate who says "vote for me because I believe all polluters deserve harsher penalties." At the

---

[3] See *Buckley* v. *Illinois Judicial Inquiry Bd.,* 997 F. 2d 224, 226 (CA7 1993).

very least, such statements obscure the appearance of open-mindedness. More importantly, like the reasoning in the Court's opinion, they create the false impression that the standards for the election of political candidates apply equally to candidates for judicial office.[4]

The Court seems to have forgotten its prior evaluation of the importance of maintaining public confidence in the "disinterestedness" of the judiciary. Commenting on the danger that participation by judges in a political assignment might erode that public confidence, we wrote: "While the problem of individual bias is usually cured through recusal, no such mechanism can overcome the appearance of institutional partiality that may arise from judiciary involvement in the making of policy. The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta* v. *United States*, 488 U. S. 361, 407 (1989).

Conversely, the judicial reputation for impartiality and openmindedness is compromised by electioneering that emphasizes the candidate's personal predilections rather than his qualifications for judicial office. As an elected judge recently noted:

"Informed criticism of court rulings, or of the professional or personal conduct of judges, should play an

---

[4] JUSTICE KENNEDY would go even further and hold that no content-based restriction of a judicial candidate's speech is permitted under the First Amendment. *Ante*, at 793 (concurring opinion). While he does not say so explicitly, this extreme position would preclude even Minnesota's prohibition against "pledges or promises" by a candidate for judicial office. Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2002). A candidate could say "vote for me because I promise to never reverse a rape conviction," and the Board could do nothing to formally sanction that candidate. The unwisdom of this proposal illustrates why the same standards should not apply to speech in campaigns for judicial and legislative office.

important role in maintaining judicial accountability. However, attacking courts and judges—not because they are wrong on the law or the facts of a case, but because the decision is considered wrong simply as a matter of political judgment—maligns one of the basic tenets of judicial independence—intellectual honesty and dedication to enforcement of the rule of law regardless of popular sentiment. Dedication to the rule of law requires judges to rise above the political moment in making judicial decisions. What is so troubling about criticism of court rulings and individual judges based solely on political disagreement with the outcome is that it evidences a fundamentally misguided belief that the judicial branch should operate and be treated just like another constituency-driven political arm of government. Judges should not have 'political constituencies.' Rather, a judge's fidelity must be to enforcement of the rule of law regardless of perceived popular will." De Muniz, Politicizing State Judicial Elections: A Threat to Judicial Independence, 38 Willamette L. Rev. 367, 387 (2002).

The disposition of this case on the flawed premise that the criteria for the election to judicial office should mirror the rules applicable to political elections is profoundly misguided. I therefore respectfully dissent.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Whether state or federal, elected or appointed, judges perform a function fundamentally different from that of the people's elected representatives. Legislative and executive officials act on behalf of the voters who placed them in office; "judge[s] represen[t] the Law." *Chisom v. Roemer*, 501 U. S. 380, 411 (1991) (SCALIA, J., dissenting). Unlike their counterparts in the political branches, judges are expected to

refrain from catering to particular constituencies or committing themselves on controversial issues in advance of adversarial presentation. Their mission is to decide "individual cases and controversies" on individual records, *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 266 (1995) (STEVENS, J., dissenting), neutrally applying legal principles, and, when necessary, "stand[ing] up to what is generally supreme in a democracy: the popular will," Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1180 (1989).

A judiciary capable of performing this function, owing fidelity to no person or party, is a "longstanding Anglo-American tradition," *United States* v. *Will*, 449 U. S. 200, 217 (1980), an essential bulwark of constitutional government, a constant guardian of the rule of law. The guarantee of an independent, impartial judiciary enables society to "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 638 (1943). "Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961).

The ability of the judiciary to discharge its unique role rests to a large degree on the manner in which judges are selected. The Framers of the Federal Constitution sought to advance the judicial function through the structural protections of Article III, which provide for the selection of judges by the President on the advice and consent of the Senate, generally for lifetime terms. Through its own Constitution, Minnesota, in common with most other States, has decided to allow its citizens to choose judges directly in periodic elections. But Minnesota has not thereby opted to install a corps of political actors on the bench; rather, it has endeavored to preserve the integrity of its judiciary by other means. Recognizing that the influence of political parties is incompatible with the judge's role, for example, Minnesota

has designated all judicial elections nonpartisan. See *Peterson* v. *Stafford,* 490 N. W. 2d 418, 425 (Minn. 1992). And it has adopted a provision, here called the Announce Clause, designed to prevent candidates for judicial office from "publicly making known how they would decide issues likely to come before them as judges." *Republican Party of Minn.* v. *Kelly,* 247 F. 3d 854, 881–882 (CA8 2001).

The question this case presents is whether the First Amendment stops Minnesota from furthering its interest in judicial integrity through this precisely targeted speech restriction.

I

The speech restriction must fail, in the Court's view, because an electoral process is at stake; if Minnesota opts to elect its judges, the Court asserts, the State may not rein in what candidates may say. See *ante,* at 781 (notion that "right to speak out on disputed issues" may be abridged in an election context "sets our First Amendment jurisprudence on its head"); *ante,* at 787–788 (power to dispense with elections does not include power to curtail candidate speech if State leaves election process in place); 247 F. 3d, at 897 (Beam, J., dissenting) ("[W]hen a state opts to hold an election, it must commit itself to a complete election, replete with free speech and association."); *id.,* at 903 (same).

I do not agree with this unilocular, "an election is an election," approach. Instead, I would differentiate elections for political offices, in which the First Amendment holds full sway, from elections designed to select those whose office it is to administer justice without respect to persons. Minnesota's choice to elect its judges, I am persuaded, does not preclude the State from installing an election process geared to the judicial office.

Legislative and executive officials serve in representative capacities. They are agents of the people; their primary function is to advance the interests of their constituencies. Candidates for political offices, in keeping with their repre-

sentative role, must be left free to inform the electorate of their positions on specific issues. Armed with such information, the individual voter will be equipped to cast her ballot intelligently, to vote for the candidate committed to positions the voter approves. Campaign statements committing the candidate to take sides on contentious issues are therefore not only appropriate in political elections; they are "at the core of our electoral process," *Williams* v. *Rhodes,* 393 U. S. 23, 32 (1968), for they "enhance the accountability of government officials to the people whom they represent," *Brown* v. *Hartlage,* 456 U. S. 45, 55 (1982).

Judges, however, are not political actors. They do not sit as representatives of particular persons, communities, or parties; they serve no faction or constituency. "[I]t is the business of judges to be indifferent to popularity." *Chisom,* 501 U. S., at 401, n. 29 (internal quotation marks omitted). They must strive to do what is legally right, all the more so when the result is not the one "the home crowd" wants. Rehnquist, Dedicatory Address: Act Well Your Part: Therein All Honor Lies, 7 Pepperdine L. Rev. 227, 229–300 (1980). Even when they develop common law or give concrete meaning to constitutional text, judges act only in the context of individual cases, the outcome of which cannot depend on the will of the public. See *Barnette,* 319 U. S., at 638 ("One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").

Thus, the rationale underlying unconstrained speech in elections for political office—that representative government depends on the public's ability to choose agents who will act at its behest—does not carry over to campaigns for the bench. As to persons aiming to occupy the seat of judgment, the Court's unrelenting reliance on decisions involving contests for legislative and executive posts is manifestly out of place. *E. g., ante,* at 781–782 (quoting *Wood* v. *Georgia,*

370 U. S. 375, 395 (1962) (*"The role that elected officials play in our society* makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." (Emphasis added.))). See O'Neil, The Canons in the Courts: Recent First Amendment Rulings, 35 Ind. L. Rev. 701, 717 (2002) (reliance on cases involving non-judicial campaigns, particularly *Brown* v. *Hartlage*, is "grievously misplaced"; "[h]ow any thoughtful judge could derive from that ruling any possible guidance for cases that involve judicial campaign speech seems baffling"). In view of the magisterial role judges must fill in a system of justice, a role that removes them from the partisan fray, States may limit judicial campaign speech by measures impermissible in elections for political office. See *Buckley* v. *Illinois Judicial Inquiry Bd.*, 997 F. 2d 224, 228 (CA7 1993) ("Mode of appointment is only one factor that enables distinctions to be made among different kinds of public official. Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength of the state's interest in restricting their freedom of speech.").

The Court sees in this conclusion, and in the Announce Clause that embraces it, "an obvious tension," *ante*, at 787: The Minnesota electorate is permitted to select its judges by popular vote, but is not provided information on "subjects of interest to the voters," *ibid.*—in particular, the voters are not told how the candidate would decide controversial cases or issues if elected. This supposed tension, however, rests on the false premise that by departing from the federal model with respect to who *chooses* judges, Minnesota necessarily departed from the federal position on the *criteria* relevant to the exercise of that choice.[1]

---

[1] In the context of the federal system, how a prospective nominee for the bench would resolve particular contentious issues would certainly be "of interest" to the President and the Senate in the exercise of their respective nomination and confirmation powers, just as information of that type would "interest" a Minnesota voter. But in accord with a longstand-

The Minnesota Supreme Court thought otherwise:

> "The methods by which the federal system and other states initially select and then elect or retain judges are varied, yet the explicit or implicit goal of the constitutional provisions and enabling legislation is the same: to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences." *Peterson*, 490 N. W. 2d, at 420.

Nothing in the Court's opinion convincingly explains why Minnesota may not pursue that goal in the manner it did.

Minnesota did not choose a judicial selection system with all the trappings of legislative and executive races. While providing for public participation, it tailored judicial selection to fit the character of third branch office holding. See *id.*, at 425 (Minnesota's system "keep[s] the ultimate choice with the voters while, at the same time, recognizing the unique independent nature of the judicial function."). The balance the State sought to achieve—allowing the people to elect judges, but safeguarding the process so that the integrity of the judiciary would not be compromised—should en-

---

ing norm, every Member of this Court declined to furnish such information to the Senate, and presumably to the President as well. See Brief for Respondents 17–42 (collecting statements at Senate confirmation hearings). Surely the Court perceives no tension here; the line each of us drew in response to preconfirmation questioning, the Court would no doubt agree, is crucial to the health of the Federal Judiciary. But by the Court's reasoning, the reticence of prospective and current federal judicial nominees dishonors Article II, for it deprives the President and the Senate of information that might aid or advance the decision to nominate or confirm. The point is not, of course, that this "practice of voluntarily demurring" by itself "establish[es] the legitimacy of legal compulsion to demur," *ante*, at 783–784, n. 11 (emphasis deleted). The federal norm simply illustrates that, contrary to the Court's suggestion, there is nothing inherently incongruous in depriving those charged with choosing judges of certain information they might desire during the selection process.

counter no First Amendment shoal.  See generally O'Neil, *supra,* at 715–723.

## II

Proper resolution of this case requires correction of the Court's distorted construction of the provision before us for review.   According to the Court, the Announce Clause "prohibits a judicial candidate from stating his views on any specific nonfanciful legal question within the province of the court for which he is running, except in the context of discussing past decisions—and in the latter context as well, if he expresses the view that he is not bound by *stare decisis.*" *Ante,* at 773.   In two key respects, that construction misrepresents the meaning of the Announce Clause as interpreted by the Eighth Circuit and embraced by the Minnesota Supreme Court, *In re Code of Judicial Conduct,* 639 N. W. 2d 55 (2002), which has the final word on this matter, see *Hortonville Joint School Dist. No. 1* v. *Hortonville Ed. Assn.,* 426 U. S. 482, 488 (1976) ("We are, of course, bound to accept the interpretation of [the State's] law by the highest court of the State.").

First and most important, the Court ignores a crucial limiting construction placed on the Announce Clause by the courts below.   The provision does not bar a candidate from generally "stating [her] views" on legal questions, *ante,* at 773; it prevents her from "publicly making known how [she] would *decide*" disputed issues, 247 F. 3d, at 881–882 (emphasis added).   That limitation places beyond the scope of the Announce Clause a wide range of comments that may be highly informative to voters.   Consistent with the Eighth Circuit's construction, such comments may include, for example, statements of historical fact ("As a prosecutor, I obtained 15 drunk driving convictions"); qualified statements ("Judges should use *sparingly* their discretion to grant lenient sentences to drunk drivers"); and statements framed

at a sufficient level of generality ("Drunk drivers are a threat to the safety of every driver"). What remains within the Announce Clause is the category of statements that essentially commit the candidate to a position on a specific issue, such as "I think all drunk drivers should receive the maximum sentence permitted by law." See Tr. of Oral Arg. 45 (candidate may not say " 'I'm going to decide this particular issue this way in the future' ").

Second, the Court misportrays the scope of the Clause as applied to a candidate's discussion of past decisions. Citing an apparent concession by respondents at argument, *id.*, at 33–34, the Court concludes that "statements critical of past judicial decisions are not permissible if the candidate also states that he is against *stare decisis,*" *ante,* at 772 (emphasis deleted). That conclusion, however, draws no force from the meaning attributed to the Announce Clause by the Eighth Circuit. In line with the Minnesota Board on Judicial Standards, the Court of Appeals stated without qualification that the Clause "does not prohibit candidates from discussing appellate court decisions." 247 F. 3d, at 882 (citing Minn. Bd. on Judicial Standards, Informal Opinion, Oct. 10, 1990, App. 55 ("In all election contests, a candidate for judicial office may discuss decisions and opinions of the Appellate courts.")). The Eighth Circuit's controlling construction should not be modified by respondents' on the spot answers to fast-paced hypothetical questions at oral argument. *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 170 (1972) ("We are loath to attach conclusive weight to the relatively spontaneous responses of counsel to equally spontaneous questioning from the Court during oral argument.").

The Announce Clause is thus more tightly bounded, and campaigns conducted under that provision more robust, than the Court acknowledges. Judicial candidates in Minnesota may not only convey general information about themselves, see *ante,* at 774, they may also describe their conception of the role of a judge and their views on a wide range of sub-

jects of interest to the voters. See App. 97–103; Brief for Minnesota State Bar Association as *Amicus Curiae* 22–23 (*e. g.,* the criteria for deciding whether to depart from sentencing guidelines, the remedies for racial and gender bias, and the balance between "free speech rights [and] the need to control [hate crimes]" (internal quotation marks omitted)). Further, they may discuss, criticize, or defend past decisions of interest to voters. What candidates may not do—simply or with sophistication—is remove themselves from the constraints characteristic of the judicial office and declare how they would decide an issue, without regard to the particular context in which it is presented, *sans* briefs, oral argument, and, as to an appellate bench, the benefit of one's colleagues' analyses. Properly construed, the Announce Clause prohibits only a discrete subcategory of the statements the Court's misinterpretation encompasses.

The Court's characterization of the Announce Clause as "election-nullifying," *ante,* at 782, "plac[ing] most subjects of interest to the voters off limits," *ante,* at 787, is further belied by the facts of this case. In his 1996 bid for office, petitioner Gregory Wersal distributed literature sharply criticizing three Minnesota Supreme Court decisions. Of the court's holding in the first case—that certain unrecorded confessions must be suppressed—Wersal asked, "Should we conclude that because the Supreme Court does not trust police, it allows confessed criminals to go free?" App. 37. Of the second case, invalidating a state welfare law, Wersal stated: "The Court should have deferred to the Legislature. It's the Legislature which should set our spending policies." *Ibid.* And of the third case, a decision involving abortion rights, Wersal charged that the court's holding was "directly contrary to the opinion of the U. S. Supreme Court," "unprecedented," and a "pro-abortion stance." *Id.,* at 38.

When a complaint was filed against Wersal on the basis of those statements, *id.,* at 12–15, the Lawyers Professional Responsibility Board concluded that no discipline was war-

ranted, in part because it thought the disputed campaign materials did not violate the Announce Clause, *id.*, at 20–21. And when, at the outset of his 1998 campaign, Wersal sought to avoid the possibility of sanction for future statements, he pursued the option, available to all Minnesota judicial candidates, Tr. of Oral Arg. 12–13, of requesting an advisory opinion concerning the application of the Announce Clause. App. 24–26. In response to that request, the Board indicated that it did not anticipate any adverse action against him. *Id.*, at 31–33.[2] Wersal has thus never been sanctioned under the Announce Clause for any campaign statement he made. On the facts before us, in sum, the Announce Clause has hardly stifled the robust communication of ideas and views from judicial candidate to voter.

### III

Even as it exaggerates the reach of the Announce Clause, the Court ignores the significance of that provision to the integrated system of judicial campaign regulation Minnesota has developed. Coupled with the Announce Clause in Minnesota's Code of Judicial Conduct is a provision that prohibits candidates from "mak[ing] pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office." Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2002). Although the Court is correct that this "pledges or promises" provision is not directly at issue in this case, see *ante*, at 770, the Court errs in overlooking the interdependence of that prohibition and the one before us. In my view, the constitutionality of the Announce

---

[2] In deciding not to sanction Wersal for his campaign statements, and again in responding to his inquiry about the application of the Announce Clause, the Board expressed "doubts about the constitutionality of the current Minnesota Canon." App. 20; *id.*, at 32. Those doubts, however, concerned the meaning of the Announce Clause before the Eighth Circuit applied, and the Minnesota Supreme Court adopted, the limiting constructions that now define that provision's scope.

Clause cannot be resolved without an examination of that interaction in light of the interests the pledges or promises provision serves.

### A

All parties to this case agree that, whatever the validity of the Announce Clause, the State may constitutionally prohibit judicial candidates from pledging or promising certain results. See Brief for Petitioners Republican Party of Minnesota et al. 36–37; Tr. of Oral Arg. 14–16 (petitioners' acknowledgment that candidates may be barred from making a "pledge or promise of an outcome"); Brief for Respondents 11; see also Brief for Brennan Center for Justice et al. as *Amici Curiae* 23 ("All of the parties and *amici* in this case agree that judges should not make explicit promises or commitments to decide particular cases in a particular manner.").

The reasons for this agreement are apparent. Pledges or promises of conduct in office, however commonplace in races for the political branches, are inconsistent "with the judge's obligation to decide cases in accordance with his or her role." Tr. of Oral Arg. 16; see Brief for Petitioners Republican Party of Minnesota et al. 36 ("[B]ecause [judges] have a duty to decide a case on the basis of the law and facts before them, they can be prohibited, as candidates, from making such promises."). This judicial obligation to avoid prejudgment corresponds to the litigant's right, protected by the Due Process Clause of the Fourteenth Amendment, to "an impartial and disinterested tribunal in both civil and criminal cases," *Marshall* v. *Jerrico, Inc.,* 446 U. S. 238, 242 (1980). The proscription against pledges or promises thus represents an accommodation of "constitutionally protected interests [that] lie on both sides of the legal equation." *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 400 (2000) (BREYER, J., concurring). Balanced against the candidate's interest in free expression is the litigant's "powerful and independent constitutional interest in fair adjudicative procedure." *Marshall,* 446 U. S., at 243; see *Buckley,* 997 F. 2d,

at 227 ("Two principles are in conflict and must, to the extent possible, be reconciled. . . . The roots of both principles lie deep in our constitutional heritage.").

The impartiality guaranteed to litigants through the Due Process Clause adheres to a core principle: "[N]o man is permitted to try cases where he has an interest in the outcome." *In re Murchison*, 349 U. S. 133, 136 (1955). Our cases have "jealously guarded" that basic concept, for it "ensur[es] that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall*, 446 U. S., at 242.

Applying this principle in *Tumey* v. *Ohio*, 273 U. S. 510 (1927), we held that due process was violated where a judge received a portion of the fines collected from defendants whom he found guilty. Such an arrangement, we said, gave the judge a "direct, personal, substantial[, and] pecuniary interest" in reaching a particular outcome and thereby denied the defendant his right to an impartial arbiter. *Id.*, at 523. *Ward* v. *Monroeville*, 409 U. S. 57 (1972), extended *Tumey*'s reasoning, holding that due process was similarly violated where fines collected from guilty defendants constituted a large part of a village's finances, for which the judge, who also served as the village mayor, was responsible. Even though the mayor did not personally share in those fines, we concluded, he "perforce occupie[d] two practically and seriously inconsistent positions, one partisan and the other judicial." 409 U. S., at 60 (internal quotation marks omitted).

We applied the principle of *Tumey* and *Ward* most recently in *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813 (1986). That decision invalidated a ruling of the Alabama Supreme Court written by a justice who had a personal interest in the resolution of a dispositive issue. The Alabama Supreme Court's ruling was issued while the justice was pursuing a separate lawsuit in an Alabama lower court, and its outcome "had the clear and immediate effect of enhancing both the legal status

and the settlement value" of that separate suit. *Id.*, at 824. As in *Ward* and *Tumey*, we held, the justice therefore had an interest in the outcome of the decision that unsuited him to participate in the judgment. 475 U. S., at 824. It mattered not whether the justice was actually influenced by this interest; "[t]he Due Process Clause," we observed, "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Id.*, at 825 (internal quotation marks omitted).

These cases establish three propositions important to this dispute. First, a litigant is deprived of due process where the judge who hears his case has a "direct, personal, substantial, and pecuniary" interest in ruling against him. *Id.*, at 824 (internal quotation marks and alteration omitted). Second, this interest need not be as direct as it was in *Tumey*, where the judge was essentially compensated for each conviction he obtained; the interest may stem, as in *Ward*, from the judge's knowledge that his success and tenure in office depend on certain outcomes. "[T]he test," we have said, "is whether the . . . situation is one 'which would offer a possible temptation to the average man as a judge [that] might lead him not to hold the balance nice, clear and true.'" *Ward*, 409 U. S., at 60 (quoting *Tumey*, 273 U. S., at 532). And third, due process does not require a showing that the judge is actually biased as a result of his self-interest. Rather, our cases have "always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U. S., at 136. "[T]he requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice." *Tumey*, 273 U. S., at 532.[3]

---

[3] To avoid the import of our due process decisions, the Court dissects the concept of judicial "impartiality," *ante*, at 775–779, concluding that only one variant of that concept—lack of prejudice against a *party*—is secured by the Fourteenth Amendment, *ante*, at 775–777. Our Due Proc-

The justification for the pledges or promises prohibition follows from these principles. When a judicial candidate promises to rule a certain way on an issue that may later reach the courts, the potential for due process violations is grave and manifest. If successful in her bid for office, the judicial candidate will become a judge, and in that capacity she will be under pressure to resist the pleas of litigants who advance positions contrary to her pledges on the campaign trail. If the judge fails to honor her campaign promises, she will not only face abandonment by supporters of her professed views; she will also "ris[k] being assailed as a dissembler," 247 F. 3d, at 878, willing to say one thing to win an election and to do the opposite once in office.

A judge in this position therefore may be thought to have a "direct, personal, substantial, [and] pecuniary interest" in ruling against certain litigants, *Tumey*, 273 U. S., at 523, for she may be voted off the bench and thereby lose her salary and emoluments unless she honors the pledge that secured her election. See Shepard, Campaign Speech: Restraint and Liberty in Judicial Ethics, 9 Geo. J. Legal Ethics 1059, 1083–1092 (1996); see *id.*, at 1088 ("[A] campaign promise [may be characterized as] a bribe offered to voters, paid with rulings consistent with that promise, in return for continued employ-

---

ess Clause cases do not focus solely on bias against a particular party, but rather inquire more broadly into whether the surrounding circumstances and incentives compromise the judge's ability faithfully to discharge her assigned duties. See *supra*, at 815. To be sure, due process violations may arise where a judge has been so personally "enmeshed in matters" concerning one party that he is biased against him. See *Johnson* v. *Mississippi*, 403 U. S. 212, 215 (1971) *(per curiam)* (judge had been "a defendant in one of petitioner's civil rights suits and a losing party at that"). They may also arise, however, not because of any predisposition toward a party, but rather because of the judge's personal interest in resolving an issue a certain way. See *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813 (1986). Due process will not countenance the latter situation, even though the self-interested judge "will apply the law to [the losing party] in the same way he [would apply] it to any other party" advancing the same position, *ante*, at 776.

ment as a judge."); see also The Federalist No. 79, p. 472 (C. Rossiter ed. 1961) ("In the general course of human nature, a power over a man's subsistence amounts to a power over his will." (emphasis deleted)).

Given this grave danger to litigants from judicial campaign promises, States are justified in barring expression of such commitments, for they typify the "situatio[n] . . . in which experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable." *Withrow* v. *Larkin*, 421 U. S. 35, 47 (1975). By removing this source of "possible temptation" for a judge to rule on the basis of self-interest, *Tumey*, 273 U. S., at 532, the pledges or promises prohibition furthers the State's "compellin[g] interest in maintaining a judiciary fully capable of performing" its appointed task, *Gregory* v. *Ashcroft*, 501 U. S. 452, 472 (1991): "judging [each] particular controversy fairly on the basis of its own circumstances," *United States* v. *Morgan*, 313 U. S. 409, 421 (1941). See O'Neil, 35 Ind. L. Rev., at 723 ("What is at stake here is no less than the promise of fairness, impartiality, and ultimately of due process for those whose lives and fortunes depend upon judges being selected by means that are not fully subject to the vagaries of American politics.").

In addition to protecting litigants' due process rights, the parties in this case further agree, the pledges or promises clause advances another compelling state interest: preserving the public's confidence in the integrity and impartiality of its judiciary. See Tr. of Oral Arg. 16 (petitioners' statement that pledges or promises properly fosters "public perception of the impartiality of the judiciary"). See *Cox* v. *Louisiana*, 379 U. S. 559, 565 (1965) ("A State may . . . properly protect the judicial process from being misjudged in the minds of the public."); *In re Murchison*, 349 U. S., at 136 ("[T]o perform its high function in the best way[,] 'justice must satisfy the appearance of justice.'" (quoting *Offutt* v. *United States*, 348 U. S. 11, 14 (1954))). Because courts con-

trol neither the purse nor the sword, their authority ultimately rests on public faith in those who don the robe. See *Mistretta* v. *United States,* 488 U. S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."). As the Minnesota Supreme Court has recognized, all legal systems—regardless of their method of judicial selection—"can function only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions." *Complaint Concerning Winton,* 350 N. W. 2d 337, 340 (1984).

Prohibiting a judicial candidate from pledging or promising certain results if elected directly promotes the State's interest in preserving public faith in the bench. When a candidate makes such a promise during a campaign, the public will no doubt perceive that she is doing so in the hope of garnering votes. And the public will in turn likely conclude that when the candidate decides an issue in accord with that promise, she does so at least in part to discharge her undertaking to the voters in the previous election and to prevent voter abandonment in the next. The perception of that unseemly *quid pro quo*—a judicial candidate's promises on issues in return for the electorate's votes at the polls—inevitably diminishes the public's faith in the ability of judges to administer the law without regard to personal or political self-interest.[4] Then-JUSTICE REHNQUIST's observations

---

[4] The author of the Court's opinion declined on precisely these grounds to tell the Senate whether he would overrule a particular case:

"Let us assume that I have people arguing before me to do it or not to do it. I think it is quite a thing to be arguing to somebody who you know has made a representation in the course of his confirmation hearings, and that is, by way of condition to his being confirmed, that he will do this or do that. I think I would be in a very bad position to adjudicate the case without being accused of having a less than impartial view of the matter." 13 R. Mersky & J. Jacobstein, The Supreme Court of the United States: Hearings and Reports on Successful and Unsuccessful Nominations of Supreme Court Justices by the Senate Judiciary Committee, 1916–1986,

about the federal system apply with equal if not greater force in the context of Minnesota's elective judiciary: Regarding the appearance of judicial integrity,

"[one must] distinguish quite sharply between a public statement made prior to nomination for the bench, on the one hand, and a public statement made by a nominee to the bench. For the latter to express any but the most general observation about the law would suggest that, in order to obtain favorable consideration of his nomination, he deliberately was announcing in advance, without benefit of judicial oath, briefs, or argument, how he would decide a particular question that might come before him as a judge." *Laird* v. *Tatum*, 409 U. S. 824, 836, n. 5 (1972) (memorandum opinion).

B

The constitutionality of the pledges or promises clause is thus amply supported; the provision not only advances due process of law for litigants in Minnesota courts, it also reinforces the authority of the Minnesota judiciary by promoting public confidence in the State's judges. The Announce Clause, however, is equally vital to achieving these compelling ends, for without it, the pledges or promises provision would be feeble, an arid form, a matter of no real importance.

Uncoupled from the Announce Clause, the ban on pledges or promises is easily circumvented. By prefacing a campaign commitment with the caveat, "although I cannot promise anything," or by simply avoiding the language of promises or pledges altogether, a candidate could declare with impunity how she would decide specific issues. Semantic sanitizing of the candidate's commitment would not, however, diminish its pernicious effects on actual and perceived judicial impartiality. To use the Court's example, a candidate

---

p. 131 (1989) (hearings before the Senate Judiciary Committee on the nomination of then-Judge Scalia).

who campaigns by saying, "If elected, I will vote to uphold the legislature's power to prohibit same-sex marriages," *ante,* at 780, will feel scarcely more pressure to honor that statement than the candidate who stands behind a podium and tells a throng of cheering supporters: "I think it is constitutional for the legislature to prohibit same-sex marriages," *ante,* at 779. Made during a campaign, both statements contemplate a *quid pro quo* between candidate and voter. Both effectively "bind [the candidate] to maintain that position after election." *Ante,* at 770. And both convey the impression of a candidate prejudging an issue to win votes. Contrary to the Court's assertion, the "nonpromissory" statement averts none of the dangers posed by the "promissory" one. See *ante,* at 780–781 (emphasis deleted).

By targeting statements that do not technically constitute pledges or promises but nevertheless "publicly mak[e] known how [the candidate] would decide" legal issues, 247 F. 3d, at 881–882, the Announce Clause prevents this end run around the letter and spirit of its companion provision.[5] No less than the pledges or promises clause itself, the Announce

---

[5] In the absence of the Announce Clause, other components of the Minnesota Code of Judicial Conduct designed to maintain the nonpartisan character of the State's judicial elections would similarly unravel. A candidate would have no need to "attend political gatherings" or "make speeches on behalf of a political organization," Minn. Code of Judical Conduct, Canon 5(A)(1)(c), (d) (2002), for she could simply state her views elsewhere, counting on her supporters to carry those views to the party faithful. And although candidates would remain barred from "seek[ing], accept[ing,] or us[ing] endorsements from a political organization," Canon 5(A)(1)(d), parties might well provide such endorsements unsolicited upon hearing candidates' views on specific issues. Cf. *ante,* at 770 (Minnesota Republican Party sought to learn Wersal's views so party could support or oppose his candidacy). Those unsolicited endorsements, in turn, would render ineffective the prohibition against candidates "identify[ing] themselves as members of a political organization," Canon 5(A)(1)(a). "Indeed, it is not too much to say that the entire fabric of Minnesota's non[p]artisan elections hangs by the Announce clause thread." Brief for Minnesota State Bar Association as *Amicus Curiae* 20.

Clause is an indispensable part of Minnesota's effort to maintain the health of its judiciary, and is therefore constitutional for the same reasons.

\* \* \*

This Court has recognized in the past, as JUSTICE O'CONNOR does today, see *ante*, at 788–790 (concurring opinion), a "fundamental tension between the ideal character of the judicial office and the real world of electoral politics," *Chisom*, 501 U. S., at 400. We have no warrant to resolve that tension, however, by forcing States to choose one pole or the other. Judges are not politicians, and the First Amendment does not require that they be treated as politicians simply because they are chosen by popular vote. Nor does the First Amendment command States that wish to promote the integrity of their judges in fact and appearance to abandon systems of judicial selection that the people, in the exercise of their sovereign prerogatives, have devised.

For more than three-quarters of a century, States like Minnesota have endeavored, through experiment tested by experience, to balance the constitutional interests in judicial integrity and free expression within the unique setting of an elected judiciary. P. McFadden, Electing Justice: The Law and Ethics of Judicial Election Campaigns 86 (1990); Brief for the Conference of Chief Justices as *Amicus Curiae* 5. The Announce Clause, borne of this long effort, "comes to this Court bearing a weighty title of respect," *Teamsters v. Hanke*, 339 U. S. 470, 475 (1950). I would uphold it as an essential component in Minnesota's accommodation of the complex and competing concerns in this sensitive area. Accordingly, I would affirm the judgment of the Court of Appeals for the Eighth Circuit.