BEAM, Circuit Judge.
This case presents the question of whether three provisions of the Minnesota Code of Judicial Conduct (Code) unconstitutionally infringe upon First Amendment rights of judicial candidates. Gregory Wersal, a candidate for Justice of the Minnesota Supreme Court, asserts that the so called “endorsement,” “personal solicitation,” and “solicitation for a political organization or candidate” clauses of Canon 4[1] are unconstitutional on their face or as applied to him. On cross-motions for summary judgment, the district court rejected Wersal’s First Amendment claims and granted summary judgment to the appellees — members of the Minnesota Board of Judicial Standards and the Minnesota Lawyers Professional Responsibility Board. Wersal appeals, and we reverse.
I. BACKGROUND
This case has its roots in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (White I), and this court’s prior en banc decision, Republican Party of Minnesota v. White, 416 F.3d 738 (8th Cir.2005) (en banc) (White II). In those opinions, Wersal, among others, successfully challenged the so called “announce,” “partisan-activities,” and “solicitation” clauses of Canon 5 on First Amendment grounds. White I, 536 U.S. at 788, 122 S.Ct. 2528 (announce clause); White II, 416 F.3d at 766 (partisan-activities and solicitation clauses). In an effort to bring the Code into compliance with the White decisions, the Minnesota Supreme Court removed the “announce” and “partisan-activities” clauses from the Code and amended the “solicitation clause.” Wersal now maintains that the amendments to the solicitation clause do not cure its invasion of his First Amendment rights, and that the endorsement clause improperly restricts expression protected by the First Amendment.
*827 The endorsement clause — Canon 4.1(A)(3) — and the solicitation clauses— Canon 4.1(A)(4) and (6) — each rein in a judicial candidate’s[2] speech.[3] The endorsement clause prevents a judicial candidate from “publicly endorsing] or, except for the judge or candidate’s opponent, publicly opposing] another candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3). The personal solicitation clause prohibits a judicial candidate from “personally solicit[ing] or accepting] campaign contributions,” id. at 4.1(A)(6), and the solicitation for a political organization or candidate clause provides that a judicial candidate shall not “solicit funds for a political organization or a candidate for public office,” id. at 4.1(A)(4)(a).[4]
The facts of this case indicate the degree to which these particular provisions have chilled Wersal’s speech. In early 2007, Wersal announced his intention to run for the office of Chief Justice of the Minnesota Supreme Court. As part of his campaign, Wersal wanted to publicly endorse certain other candidates for public office. Specifically, he desired to support Tim Tinglested, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress. However, the endorsement clause prevented Wersal from engaging in any such public endorsement of these candidates.
Moreover, Wersal wanted to personally solicit funds for his 2008 campaign from non-attorneys by going door-to-door and by making personal phone calls asking for financial support although he pledged (and continues to pledge) to recuse himself from any case in which a known contributor is or becomes a party. However, the personal solicitation clause specifically barred him from engaging in such activity, and Wersal felt that the solicitation for a political organization or candidate clause further constrained his efforts in seeking financial contributions from non-attorneys. Accordingly, Wersal believed that he could not wage an effective campaign as long as the endorsement and solicitation clauses remained in force. He, therefore, asked for injunctive and declaratory relief in the district court. After it became apparent that Wersal would not be able to get adequate relief prior to the 2008 campaign, he decided not to run for the Minnesota Supreme Court in 2008, but to instead run for the Minnesota Supreme Court during the 2010 elections.[5] In furtherance of his 2010 campaign, Wersal wishes to engage in conduct parallel to that which he sought to engage during the 2008 campaign. However, just as in 2008, Wersal continues to feel limited by the contested clauses.
*828 In granting the appellees’ motion for summary judgment, the district court held (1) Wersal’s challenge to the solicitation for political organization or candidate clause was not ripe; and (2) the endorsement and personal solicitation clauses were narrowly tailored to meet the state’s legitimate interest in protecting judicial impartiality.
II. DISCUSSION
A. Judicial Selection and Political Speech
Minnesota chooses to elect the judges of its courts. Minn. Const, art. 6, § 7. While we have confessed “some bias in favor of a system for the appointment of judges,” the sovereignty of the states within our federal system guarantees that “Minnesota may choose (and has repeatedly chosen) to elect its appellate judges.” White II, 416 F.3d at 746, 747. But “[i]f Minnesota sees fit to elect its judges, which it does, it must do so using a process that passes constitutional muster.” Id. at 748.
Minnesota has enacted Canon 4 of the Code in an effort to regulate judicial elections. In White I, the Supreme Court held the announce clause, which prohibited judicial candidates from stating their views on disputed legal issues, unconstitutional. In White II, an en banc court of this circuit held the partisan-activities and solicitation clauses unconstitutional. It now falls to this panel to determine whether the endorsement, personal solicitation, and solicitation for a political organization or candidate clauses are permissible under the First Amendment.
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. Inherent within this protection is the “corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.” Roberts v. U.S. Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); see also Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“The First Amendment protects political association as well as political expression.”). And, the First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
The political speech burdened by the clauses at issue in this case is “the very stuff of the First Amendment.” White II, 416 F.3d at 748. Indeed, “ ‘the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.’ ” Id. (alteration in original) (quoting Buckley, 424 U.S. at 15, 96 S.Ct. 612). Our system of representative democracy relies on such a protection of political speech, “for it is the means to hold officials accountable to the people.” Citizens United v. FEC, — U.S. -, 130 S.Ct. 876, 898, — L.Ed.2d - (2010); see also Buckley, 424 U.S. at 14-15, 96 S.Ct. 612 (“In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.”). “For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence.” Citizens United, 130 S.Ct. at 898.
Indeed, so strong is the protection of political speech that the Court recently indicated that “it might be maintained that political speech simply cannot be banned or restricted as a categorical matter.” Id.
*829 However, the Court stopped short of placing a categorical ban on political speech restrictions, choosing instead to examine laws burdening political speech under “strict scrutiny.” Id. Thus, we only permit restraint of political speech where, upon strict scrutiny, the regulation “advances a compelling state interest and is narrowly tailored to serve that interest.” White II, 416 F.3d at 749.
Canon 4’s restrictions on endorsements of candidates and solicitation of campaign funds directly limit judicial candidates’ political speech. And, Canon 4’s restriction on whom a candidate may endorse limits a candidate’s right to associate with others who share common political beliefs and aims. Thus, Minnesota’s endorsement and solicitation clauses burden political speech and must be examined under strict scrutiny.
B. Canon 4.1(A)(4)(a)’s Ripeness
Before we apply strict scrutiny to the clauses, we must first ask whether Wersal’s challenge to the political organization or candidate solicitation clause— Canon 4.1(A)(4)(a) — is ripe for review. This clause provides that a judicial candidate shall not “solicit funds for a political organization or a candidate for public office.” [6] 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). The district court held that Wersal’s challenge to this restriction was not ripe because the intent of this rule was to restrict candidate’s from soliciting funds for political parties and other candidates. Specifically, the court held that the issue was not ripe because (1) the clause had never been applied to a candidate’s solicitations for his or her own campaign; (2) Wersal’s campaign committee was not a “political organization” as defined by the Code; (3) Wersal had not sought an advisory opinion as to whether the clause would apply to solicitations for his campaign; and (4) Wersal’s interpretation was an absurd reading of the Code which was contrary to its plain meaning. We disagree.
The ripeness doctrine “prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.” Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), rev’d on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Before the federal courts may address a question, “there must exist ‘a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.’ ” Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1037-38 (8th Cir.2000) (quoting Babbitt v. United Farm Workers Nat’l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Accordingly, to determine whether a dispute is ripe for judicial review we consider “(1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development.” Nat’l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 692-93 (8th Cir.2003) (citing Ohio Forestry Ass’n v. Sierra Club, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)).
The district court’s ripeness analysis is flawed in four ways. First, the fact that the clause has never been applied to prohibit a candidate from soliciting contribu *830 tions for his or her own campaign does not dispositively indicate that the provision would never be so applied. Second, although Wersal’s own campaign committee is not a “political organization” under the Code,[7] the clause also prohibits a candidate from soliciting “funds for ... a candidate for public office,” which includes Wersal himself in this instance. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a) (emphasis added).[8] And, as we noted in White 11, clauses which restrict a candidate from soliciting funds for his own campaign are content-based restrictions which burden core political speech. 416 F.3d at 763-64. Accordingly, a plain reading of this clause chills Wersal from engaging in speech — solicitation of funds — which this court has already held is protected First Amendment expression.
Third, we do not rigidly require that the plaintiff seek a pre-enforcement advisory opinion where, as here, the regulation at issue chills protected First Amendment activity. See Minn. Citizens Concerned for Life v. FEC, 113 F.3d 129, 132 (8th Cir.1997); see also Virginia v. Am. Booksellers Ass’n, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (noting “self-censorship [is] a harm that can be realized without an actual prosecution”); Majors v. Abell, 317 F.3d 719, 721 (7th Cir.2003) (stating that “[a] plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute” (citations omitted)). Moreover, the appellees could very easily have drafted an advisory opinion in response to this litigation indicating that the clause would not be applied to a candidate’s solicitation of funds for his own campaign. That the appellees did not to do so indicates that the clause more than likely does apply to Wersal’s desires to solicit funds for his own campaign.
Fourth, our reading of this clause is neither absurd nor contrary to any other provision in the Code. Although the clause may have been intended to prevent a judicial candidate from soliciting funds for another candidate’s campaign, neither the clause itself nor the Canon as a whole compels such a reading. We note that under our reading, this clause is similar to, if not redundant with, the personal solicitation clause. But, the mere fact that a Code is redundant is not evidence of its absurdity. Moreover, we decline to impart a different meaning to language that plainly prevents the soliciting of funds for one’s own campaign.
Where a regulation, such as Canon 4.1(A)(4)(a), chills protected First Amendment activity, its hardship upon the plaintiff is sufficiently substantial to justify a pre-enforcement declaratory judgment action. Minn. Citizens, 113 F.3d at 132. Moreover, we generally consider an issue to be fit for judicial decision when the issue involved is legal rather than factual. See id. Here, the issue presented requires no further factual development, is largely a legal question, and chills protected First *831 Amendment expression. Thus, to the extent that the solicitation for a political organization or candidate clause prevents Wersal from soliciting funds for his own campaign, there exists a real, substantial and concrete dispute, and the issue is ripe for review.
C. Constitutional Framework
Having found that Wersal’s challenge to the solicitation for a political organization or candidate clause is ripe, we now turn to the constitutional issues before us.
1. Facial vs. As-Applied Challenges
Wersal encourages us to examine the facial constitutionality of these clauses. Alternatively, Wersal asserts that the clauses are at least unconstitutional as-applied. Therefore, we begin our constitutional analysis by determining whether we will examine these challenges as an as-applied challenge or as a facial challenge.
The Supreme Court cautions against holding a law facially uneonstitu: tional and encourages us to exercise “judicial restraint in a facial challenge.” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). Indeed, “a plaintiff can [generally] only succeed in a facial challenge by ‘establishing] that no set of circumstances exists under which the [law] would be valid.’” Id. at 449, 128 S.Ct. 1184 (second alteration in original) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Accordingly, “a facial challenge must fail where the [law] has a plainly legitimate sweep.” Id. (internal quotation omitted).
However, in the realm of regulations that chill speech, the Court has relaxed this standard, recently noting that “a [regulation] which chills [protected] speech can and must be invalidated where its facial invalidity has been demonstrated.” Citizens United, 130 S.Ct. at 896. Moreover, “the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government’s interest in an individual case.” United States v. Edge Broad. Co., 509 U.S. 418, 430, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) (quotation omitted).
The endorsement clause chills speech “that is beyond all doubt protected!,] makfing] it necessary in this case to” review the facial validity of that regulation. Citizens United, 130 S.Ct. at 896. As to the solicitation clauses, Wersal’s averments are very limited. He asserts only that his efforts to personally solicit funds for his own campaign from non-attorneys are thwarted by the clauses, Compl. ¶¶ 22, 44; Appellant’s Br. 15, 55, apparently recognizing that solicitation from attorneys may well raise different issues, particularly in view of the “very specific information about campaign contributions ... publicly available, notably on the Internet.” White II, 416 F.3d at 765 n. 16; see also Siefert v. Alexander, 608 F.3d 974, 990 (7th Cir. 2010) (noting that recusal from all cases involving a broad range of attorneys from whom the candidate solicited contributions could present serious practical problems for the state judiciary). Accordingly, we review the constitutionality of the solicitation clauses only as-applied to Wersal’s desire to solicit from non-attorneys for his own campaign.
2. Strict Scrutiny
Any regulation which curtails political speech violates the Constitution unless it can withstand strict scrutiny review. White II, 416 F.3d at 749. To survive strict scrutiny, the state must “show that the law that burdens the protected right *832 advances a compelling state interest and is narrowly tailored to serve that interest.” Id. This examination “is best described as an end-and-means test that asks whether the state’s purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest.” Id. at 750.
To determine whether an interest (the end) is “important enough” to justify the abridgement of core constitutional rights, we examine the regulation (the means) purportedly addressing that end. Id.
A clear indicator of the degree to which an interest is “compelling” is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being “compelling.”
Id. If the interest is sufficiently compelling, then we ask whether the regulation (the means) used to meet that end is “narrowly tailored to serve that interest.” Id. at 751. Determining whether a regulation is narrowly tailored requires an examination of several related factors. As we stated in White II,
A narrowly tailored regulation is one that actually advances the state’s interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).
Id. In other words, a regulation which burdens political speech will only withstand constitutional scrutiny if it is “as precisely tailored as possible” to meet a very important end. Id.
D. Minnesota’s Purported Compelling State Interest: Impartiality
Minnesota maintains that its interests in maintaining judicial impartiality and the appearance thereof are compelling interests worthy of supporting its regulation of judicial candidates’ speech.[9] In White I, the Supreme Court defined the bounds of Minnesota’s interest in judicial impartiality, providing that impartiality in the judicial context had three potential meanings.
One such meaning of “impartiality” is a “lack of preconception in favor of or against a particular legal view.” White I, 536 U.S. at 777, 122 S.Ct. 2528. According to the Court, Minnesota does not have a compelling interest in seeking judges who “lack ... predisposition regarding the relevant legal issues in a case.” Id. This is because “[p]roof that a Justice’s mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.” Id. at 778, 122 S.Ct. 2528 (quotation omitted). Thus, Minnesota has no compelling interest in preventing judicial preconceptions on legal issues. Id.
A second meaning of “impartiality” is “lack of bias for or against either party to [a] proceeding.” Id. at 775, 122 S.Ct. 2528. This notion “assures equal application of the law” because it “guarantees a party that the judge who hears his case will apply the law to him in the same *833 way he applies it to any other party.” Id. at 776, 122 S.Ct. 2528. The Supreme Court implied, and we have expressly held “that this meaning of impartiality describes a state interest that is compelling.” White II, 416 F.3d at 753. Because protecting litigants from biased judges presents a compelling state interest, the only question remaining is whether each or any of the challenged clauses is narrowly tailored to meet this compelling interest. We address this question in Part E below.
The third meaning of “impartiality” is “described as openmindedness,” meaning “not that [the judge has] no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case.” White I, 536 U.S. at 778, 122 S.Ct. 2528. In other words, it is impartiality that “seeks to guarantee each litigant, not an equal chance to win the legal points in the case, but at least some chance of doing so.” Id. The Court refrained from determining whether impartiality articulated as “open-mindedness” constitutes a compelling state interest, finding instead that even if it were a compelling interest, the announce clause was “woefully underinclusive” to meet such an interest. Id. at 780, 122 S.Ct. 2528. In White II, we determined that the clauses at issue were similarly “woefully underinclusive” to serve an interest in openmindedness. 416 F.3d at 758, 766.[10] Likewise, the underinclusiveness of Canon 4’s endorsement and solicitation clauses illustrates that they are, as well, woefully underinclusive in serving any such interest, whether it is compelling or not. We address this underinclusiveness below.
E. Narrow Tailoring
Although Minnesota has a compelling interest in promoting impartiality defined as a lack of bias against parties and possibly has a compelling interest in promoting impartiality defined as openmindedness, the constitutionality of the challenged regulations turns on whether the regulations are narrowly tailored to meet either of these interests. As noted above, a regulation is narrowly tailored only where it is necessary, not overinclusive, not underinclusive, and is the least restrictive alternative to address the purported state interest. Id. at 751. Each of the three clauses must independently meet this analysis. We hold that all three fail.
1. The Endorsement Clause
The endorsement clause of Canon 4.1(A)(3) prohibits a judicial candidate from “publicly endorsing] or, except for the judge or candidate’s opponent, publicly opposing] another candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3).[11] This restriction depends wholly upon the subject matter of the speech for its invocation. Candidates are not barred from talking about other candidates for any purpose other than endorsing or opposing them. *834 “Restricting speech based on its subject matter triggers the same strict scrutiny as does restricting core political speech.” White II, 416 F.3d at 763-64. This is because “[t]he First Amendment’s hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.” Carey v. Brown, 447 U.S. 455, 462 n. 6, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (quotation omitted).
Additionally, the endorsement clause burdens core political speech.[12] As we noted in White II
“[A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently evaluate the candidates’ personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandéis’ observation that in our country public discussion is a political duty, applies with special force to candidates for public office.... [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy.”
416 F.3d at 757 n. 8 (alterations in original) (quoting Buckley, 424 U.S. at 52-54, 96 S.Ct. 612). Thus, the endorsement clause burdens political expression because it impairs a candidate’s ability to vigorously advocate the election of other candidates, associate with like-minded candidates, and, thus, vigorously advocate his or her own campaign. Such a burden on core political speech triggers strict scrutiny. Citizens United, 130 S.Ct. at 898; see also White II, 416 F.3d at 748-49. Accordingly, the endorsement clause, which is a content-based restriction on core political speech, is subject to strict scrutiny review.
a. Unbiased Judges
The appellees contend that the endorsement clause is narrowly tailored to serve Minnesota’s compelling interest in impartiality articulated as a lack of bias for or against parties to a case. According to the appellees, endorsements pose a particularly acute danger to impartiality defined in this manner because a public endorsement for a candidate indicates a judicial candidate’s bias towards the endorsed party. Thus, argue the appellees, the endorsement clause is a necessary evil to protect from such a display of favoritism towards potential litigants. We disagree.
To be sure, the endorsement clause appears more narrowly tailored to serve the state’s interest in preserving a bench of judges who are unbiased towards parties than was the announce clause at issue in White I. In particular, in White I the Court noted that the announce clause was not directed to restrict “speech for or against particular parties, but rather speech for or against particular issues.” 536 U.S. at 776, 122 S.Ct. 2528. The endorsement clause, on the other hand, ap *835 pears aimed at restricting speech for or against particular parties. But, “[t]he question under our strict scrutiny test ... is not whether the [endorsement] clause serves this interest at all, but whether it is narrowly tailored to serve this interest.” Id. at 777 n. 7, 122 S.Ct. 2528. The endorsement clause fails this analysis.
The endorsement clause is overinclusive to meet this end, restricting more speech than is necessary to prevent a public display of favoritism. Although endorsements do indicate a particular connection between endorser and endorsee, a candidate may also use an endorsement as a proxy for expressing his or her views. Indeed, in some instances, endorsing a well-known candidate is a highly effective and efficient means of expressing one’s own views on issues. For example, in 1984, much of the country was aware of Ronald Reagan’s platform in his bid to serve a second term as President. A judicial candidate who agreed with President Reagan’s well-established views on, for instance, a strict interpretation of the Constitution or the need for judicial restraint, might have better and more effectively publicized his own subjective views by endorsing Mr. Reagan’s candidacy, even though it was for a non-judicial office. The same would likely have been true if it had involved President Bill Clinton’s campaign for re-election in 1996. Thus, whether it may be wise or necessary for one candidate to endorse another, from one simple statement the judicial candidate can announce his or her own views on a myriad of matters. And, it is highly unlikely that any such similar endorsee would become a party in a state judge’s court. Therefore, though the endorsement clause is aimed more narrowly at restricting speech dealing with potential parties, its reach tends to prevent candidates from expressing views on issues as well.
The district court agreed that “endorsement of a particular candidate might serve as a proxy for a position on an issue” but distinguished the clause from our partisan-activities clause analysis in White II by concluding that such a “connection lacks the force and immediacy society applies to the political organization — political issue link.” Wersal v. Sexton, 607 F.Supp.2d 1012, 1022-23 (D.Minn.2009). We think this analysis is flawed. As we noted in White II, engaging in partisan activities served to link a judicial candidate to the views espoused by the political party with which he aligns. White II, 416 F.3d at 754-55. In some respects, the association with another candidate is stronger indicia of the beliefs of the endorser than is an association with a political party. Particularly, a statement that one is a “Republican” or a “Democrat” or an “Independent” might tip the electorate off as to the type of policies that the candidate would support or reject. But, endorsing a well-established candidate denotes a particular subset of issues and policies with which the endorsing candidate may subscribe. Accordingly, we ascribe the same, if not greater, “force and immediacy” to the link between endorser and endorsee as we do between a candidate and a political party. Thus, the endorsement clause clearly restricts more speech than is necessary to serve an interest in impartiality articulated as a lack of bias for or against parties to a proceeding.
The overinclusiveness of the endorsement clause is further illustrated by the appellees’ suggestion that the endorsement of certain candidates poses an acute risk of a showing of bias for or against particular litigants. Specifically, the appellees are troubled by the notion that a judicial candidate could endorse candidates for sheriff and county attorney — persons who are likely to repeatedly appear as litigants or representatives of litigants in Minnesota *836 courts. We understand this concern. But, the clause is not so cabined. It prohibits endorsements regardless of the likelihood that the endorsee will ever appear as a party in the state’s courts. Indeed, the clause prohibits a judicial candidate from endorsing numerous candidates who are unlikely to ever personally appear as parties in Minnesota litigation, for instance the President of the United States or any Governor, Congressman or Senator from a state other than Minnesota. Given that the state’s compelling interest in preserving a lack of bias extends only to preventing bias for or against a party to a proceeding, White I, 536 U.S. at 775, 122 S.Ct. 2528, the endorsement clause easily restricts more speech than necessary to serve that asserted interest.
The endorsement clause is also underinclusive in purporting to serve the compelling interest of electing unbiased judges. In particular, the clause only prevents a candidate from endorsing other candidates for public office. Thus, a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office. Moreover, the endorsement clause would permit a candidate to endorse the acts and policies of non-candidates no matter the likelihood of their becoming litigants in a case before the court — that is businesses, labor unions, the ACLU or any public officials not running for office. Thus, the clause’s underinclusiveness belies its purported purpose of preserving impartiality defined as a lack of bias for parties.
Finally, a categorical ban on endorsements is not the least restrictive nor the most effective means of limiting party bias or its appearance. Instead, where a person who received the judge’s endorsement appears before that judge, “recusal is the least restrictive means of accomplishing the state’s interest in impartiality articulated as a lack of bias for or against parties to the case.” White II, 416 F.3d at 755. In fact, “[t]hrough recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the [endorsement] clause are thoroughly addressed without ‘burning] the house to roast the pig.’ ” Id. (third alternation in original) (quoting Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957)). Indeed, that Canon 2 requires a judge to recuse “himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned,” is evidence of that fact. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 2.11(A). And, “[c]oncern about the mere appearance of bias is also addressed by recusal.” White II, 416 F.3d at 755 (second alteration in original). This is because in Minnesota, “[t]he controlling [recusal] principle is that no judge ... ought ever to [hear] the cause of any citizen, even though he be entirely free from bias in fact, if circumstances have arisen which give a bona fide appearance of bias to litigants.” In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn.1995) (emphasis in original).
The appellees contend that recusal is not the most effective means to address the bias allegedly created by endorsements. They fear that if the state required a judge to recuse from all cases where a party to the litigation was previously endorsed by that judge, they would be forced to recuse themselves from a great number of cases, or at least from a great number of important cases. We disagree.
First, even if a judge felt compelled to recuse himself from those cases in which he had previously endorsed a party to a lawsuit, it would seemingly be an ineffective campaign strategy for a judicial candi *837 date to endorse persons almost certain to be future litigants. That is to say, to the extent the state is concerned about a judge endorsing the local sheriff and then having to recuse from all cases in which the sheriff is involved (whether as a party or material witness), it would be foolish as a matter of campaign strategy for a judicial candidate to follow such a course of action. It is almost certain that the electorate, especially if notified by a campaign opponent, would reject this tactic. Thus, we believe the electoral marketplace will adequately guard against the “parade of horribles” the appellees advance.
Second, and perhaps most importantly, contrary to the appellees’ views, Caperton v. A.T. Massey Coal Co., — U.S. -, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), is not inapposite. In Caperton, while a case was pending before the Supreme Court of Appeals of West Virginia, the CEO of an appealing corporation spent over $3 million supporting Brent Benjamin’s campaign for a seat on the court of appeals. Id. at 2257. Once Benjamin won the seat, the appellee requested that Benjamin recuse himself. Benjamin refused. Id.
In the present case, the appellees contend that Benjamin’s refusal to recuse in the face of enormous financial contributions evidences that recusal is an ineffective means of addressing potential bias. However, this argument ignores the fact that the Court remedied the due process harm in Caperton by requiring recusal. Id. at 2263-65. And, as the Supreme Court has recently noted “Caperton’s holding was limited to the rule that the judge must be recused, not that the litigant’s political speech could be banned.” Citizen’s United, 130 S.Ct. at 910. The harm in Caperton was that the judge refused to recuse himself, not that he originally accepted the $3 million in contributions. Accordingly, Caperton’s holding does not require that a judge refuse to speak during his or her campaign, only that due process demands that certain actions which occur during a judicial campaign may later require recusal. And, to the extent a judge remains reluctant to recuse from cases post-Caperton, Minnesota “remain[s] free to impose more rigorous standards for judicial disqualification” than due process requires. Caperton, 129 S.Ct. at 2267 (quotation omitted).
Accordingly, the endorsement clause is not narrowly tailored to serve any interest in electing unbiased judges and it is clearly not the least restrictive means of doing so. Thus, the clause fails strict scrutiny.
b. Openmindedness
To the extent that openmindedness constitutes a compelling state interest, the endorsement clause is woefully underinclusive. As with the announce clause in White I and the partisan-activities clause in White II, the endorsement clause was not adopted for the purpose of preserving the openness of a judge to differing legal arguments. See White I, 536 U.S. at 778, 122 S.Ct. 2528; White II, 416 F.3d at 756. And, we do not believe that a judicial candidate’s endorsement of another candidate indicates that as a judge he or she will be any less open to alternate legal conceptions of a case. Moreover, while the endorsement clause may be an indicator of views on issues, “an affirmative enunciation of views during an election campaign more directly communicates a candidate’s beliefs.” White II, 416 F.3d at 758. “If, as the Supreme Court has declared, a candidate may speak about her views on disputed issues, what appearance of ‘impartiality’ is protected by keeping a candidate from simply associating with a party that espouses the same or similar positions on the subjects about which she has spoken?” Id. Finally, if, as this court has determined, a candidate may associate with a *838 political party without affecting the judge’s openness to legal views, then what actual or apparent impartiality is protected by keeping the candidate from associating with one or more individuals on the basis of their stated views? Given this “woeful underinclusiveness” of the endorsement clause, “it is apparent that advancing judicial open-mindedness is not the purpose that ‘lies behind the prohibition at issue here.’ ” Id. (quoting White I, 536 U.S. at 779, 122 S.Ct. 2528).
c. Other Purported Interests
The appellees contend that the endorsement clause is narrowly tailored to two other interests not addressed in either of the previous White decisions. The first such interest is the matter of preventing a judicial candidate from “abusing the prestige of office.” To the extent that this interest is compelling, the endorsement clause is not narrowly tailored to address such an interest because it prevents both judicial candidates who are currently judges — those who could abuse the office — and candidates who are not currently judges — persons who cannot abuse any office because they currently hold no office — from making endorsements. Accordingly, the clause is overinclusive in meeting such an interest and fails strict scrutiny.
The second interest proffered by the appellees is an interest in “protecting the political independence of the judiciary.” [13] The very fact that Minnesota has chosen to elects its judges is indicative of its desire to promote an electorally accountable judiciary. Accordingly, Minnesota, by its current system, has itself created a politically motivated judiciary, bedeviling any claim it has in removing politics from the process. Moreover, how an interest in “protecting the political independence of the judiciary” is any different from an interest in preserving impartiality eludes us. See White I, 536 U.S. at 775 n. 6, 122 S.Ct. 2528 (collapsing a purported interest in an “independent judiciary” with an interest in impartiality). Thus, if impartiality cannot save the clauses, neither can an interest in “protecting the political independence of the judiciary.”
2. Personal Solicitation Clause
The personal solicitation clause of Canon 4.1 provides, in relevant part, that a judi *839 cial candidate shall not “personally solicit or accept campaign contributions other than as authorized by Rules 4.2 and 4.4.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6). Canons 4.2 and 4.4 permit a candidate to solicit contributions under certain circumstances. First, the candidate’s campaign committee may solicit funds on behalf of the candidate but may not disclose to the candidate the names of contributors. Id. at Canon 4.2(B)(1) & 4.4(B)(3). Second, in response to White II, Canon 4.2(B)(3) permits a candidate to
(a) make a general request for campaign contributions when speaking to an audience of 20 or more people;
(b) sign letters, for distribution by the candidate’s campaign committee, soliciting campaign contributions, if the letters direct contributions to be sent to the address of the candidate’s campaign committee and not that of the candidate; and
(c) personally solicit campaign contributions from members of the judge’s family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority.
Id. at Canon 4.2(B)(3). As stated previously, we review the validity of these clauses only as-applied to Wersal’s desire to solicit contributions from non-attorneys.
In White II, we held the solicitation clause subject to strict scrutiny because (1) it restricted speech based wholly upon the subject matter of the speech and (2) it restricted the amount of funds a judicial candidate is able to raise, burdening political speech. 416 F.3d at 763-64. Although Minnesota has amended the solicitation clause in an effort to more narrowly tailor it to the state’s interest in preserving judicial impartiality, the clause still serves as a content-based restriction which burdens core political speech. Under strict scrutiny, the appellees must prove that applying the personal solicitation clause to Wersal’s efforts to solicit from non-attorneys furthers a compelling interest and is narrowly tailored to achieve that interest. See FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007).
a. Unbiased Judges
“Keeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case.” Id. at 416 F.3d at 765. Moreover, the solicitation of funds may in fact create the appearance of impropriety in terms of the appearance of a quid pro quo. And, pursuant to Caperton, “there is a serious risk of actual bias ... when a person with a personal stake in a particular case ha[s] a significant and disproportionate influence in placing the judge on the case by raising funds [for the judge’s campaign] ... when the case was pending or imminent.” 129 S.Ct. at 2263-64. Accordingly, when judicial candidates fundraise, there is a risk that the candidate will be biased towards contributors and against non-contributors. Such a risk, however, inheres in the very practice of judicial elections. See White I, 536 U.S. at 789-90, 122 S.Ct. 2528 (O’Connor, J., concurring) (“[T]he cost of campaigning requires judicial candidates to engage in fundraising. Yet relying on campaign donations may leave judges feeling indebted to certain parties or interest groups.”). In other words, as long as Minnesota chooses to elect its judges using a system of private financing, it will be faced with the concern that contributions may impair at *840 least the appearance of a judge’s impartiality.
We note that the personal solicitation clause, as amended, is certainly more narrowly tailored to an interest in impartiality than was its predecessor. Yet, “[i]t seems unlikely ... that a judicial candidate, if elected, would be a ‘judge [who] has a direct, personal, substantial, pecuniary interest in reaching a conclusion [for or] against [a litigant in a case],’ ” based on whether the judicial candidate had solicited that litigant for a contribution. White II, 416 F.3d at 765 (third, fourth and fifth alterations in original) (quoting Turney v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). This is because such a risk comes not in the mere solicitation— the “ask” — but rather in the resulting contribution. As we noted in White II, the real due process harm comes not from the fundraising itself, but rather from a judicial candidate being able to trace contributions back to individual donors. White II, 416 F.3d at 765; see also Weaver v. Bonner, 309 F.3d 1312, 1323 (11th Cir.2002) (“Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support.”). Accordingly, restricting a candidate from personally soliciting funds does not address the state’s interest in a non-biased judiciary. Indeed, the personal solicitation clause is underinclusive in addressing such an interest because the Canon permits the candidate’s agent — the committee — to solicit funds, but prohibits the candidate from personally soliciting the same funds. Since the identity of the solicitor is irrelevant to the candidate’s ultimate bias toward a party, Minnesota’s rules on personal solicitation are not narrowly tailored to serve this interest. See Weaver, 309 F.3d at 1322-23 (noting that the risk that a judge “will be tempted to rule a particular way because of contributions ... is not significantly reduced by allowing the candidate’s agent to seek these contributions ... on the candidate’s behalf rather than the candidate seeking them himself’).
Minnesota has already provided a less restrictive alternative to prevent the candidate from tracing funds. Specifically, Canon 4 provides that a judicial candidate shall “take reasonable measures to ensure that the candidate will not obtain any information identifying those who contribute or refuse to contribute to the candidate’s campaign.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.2(A)(5). Canon 4 also specifically provides that a candidate may not “personally ... accept campaign contributions,” id. at Canon 4.1(A)(6), and prohibits the campaign committee from disclosing the identity of contributors to the candidate, id. at Canon 4.4(B)(3). And, Wersal does not challenge these requirements and prohibitions. We believe that a candidate could be allowed to make one-on-one solicitations without learning the identity of contributors. This would effectively insulate the candidate from bias-producing knowledge and would be a less restrictive alternative than a total ban on all face-to-face fund requests. Accordingly, the solicitation clause’s categorical ban on solicitations is not narrowly tailored to serve the end of unbiased judges.
Nonetheless, the appellees maintain that soliciting door-to-door poses an acute risk because through such on-the-spot canvassing, a judicial candidate will be able to tell whether an individual is likely to contribute or not. We think not. While it may be possible that a judicial candidate through direct contact may be able to tell whether a person is likely to contribute or not, Canon 4 requires that the candidate take reasonable measures to ensure that the candidate will not learn whether the person actually contributed. In any event, *841 we think it highly unlikely that after such a fleeting encounter, a candidate will remember which solicited person indicated a likelihood of contributing to the campaign or indicated a refusal to do so.
Finally, to the extent that Minnesota is rightly concerned with personal solicitations and campaign contributions that affect the public’s confidence in an unbiased judiciary, the least restrictive means of preventing such harm is recusal under the standards of Canon 2.11 should the judge become aware of receipt of a litigant’s campaign contribution (or of his or her refusal to do so). Indeed, Wersal represents that he would recuse himself from any proceeding in which a contributor is a party. As with the endorsement clause, recusal serves both to protect a litigant’s due process rights and a candidate’s right of speech through receipt of campaign contributions. Since “it is our law and our tradition that more speech, not less, is the governing rule,” Citizens United, 130 S.Ct. at 911, we think the Constitution favors stricter recusal standards and fewer speech restrictions. Moreover, just as in Citizens United, the personal solicitation clause is a “categorical ban[] on speech that [is] asymmetrical to preventing quid pro quo corruption.” Id. Accordingly, the application of the solicitation clause to Wersal’s desire to solicit from non-attorneys simply is not narrowly tailored to address Minnesota’s interest in impartiality defined as a lack of bias for or against parties to a proceeding.
b. Openmindedness
We next address whether allowing a judicial candidate to personally solicit face-to-face or to groups of smaller than twenty people would “in some way damage that judge’s ‘willingfness] to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case.’ ” White II, 416 F.3d at 766 (alteration in original) (quoting White I, 536 U.S. at 778, 122 S.Ct. 2528). Since the provisions in Canon 4 prohibit the judge from knowing the identity of contributors or being able to trace funds back to contributors, we find that it stretches credulity to believe that solicitations will in some way affect a judge’s willingness to consider differing legal views. Accordingly, applying the personal solicitation clause to solicitations addressed to non-attorneys is barely tailored, if at all, to affect the openmindedness of a judge, and fails strict scrutiny.
3. Solicitation for a Political Organization or Candidate Clause
The solicitation for a political organization or candidate clause provides, in relevant part, that a judge or candidate shall not “solicit funds for a political organization or a candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). As we noted in the ripeness discussion above, Wersal’s challenge to this provision is only ripe to the extent that the clause restricts him from soliciting money from non-attorneys for his own candidacy. Accordingly, we review this clause only to that extent. Because we have already addressed the fact that restricting a candidate from soliciting contributions from non-attorneys for his or her own campaign does not meet the strictures of strict scrutiny, we simply incorporate our earlier analysis here. And, we hold that the solicitation for a political organization or candidate clause, to the extent it prohibits Wersal from soliciting funds for his own campaign from non-attorneys, fails strict scrutiny review.
III. CONCLUSION
In White I, the Supreme Court struck down the announce clause as violating a *842 judicial candidate’s free speech rights. Similarly, in White II, we held that the partisan-activities and solicitation clauses did not survive strict scrutiny and thus violated the First Amendment. Today, after once again considering Minnesota’s Code of Conduct, we find that the endorsement, personal solicitation, and solicitation for a political organization clauses similarly fail strict scrutiny. We therefore reverse the district court, and remand with instructions to enter summary judgement for the appellant.

. When Wersal initiated this lawsuit, these clauses were set forth in Canon 5. Prior to this appeal, however, the Minnesota Supreme Court revised the Code. See Order Promulgating Revised Minn. Code of Judicial Conduct, No. ADM08-8004 (Minn. Dec. 18, 2008) (effective July 1, 2009), available at http://www. bjs.state.mn.us. As a result of those revisions, the challenged clauses are now located in Canon 4.

. The Code defines "judicial candidate” as "any person, including a sitting judge, who is seeking selection for judicial office by election or appointment.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology.

. Notably, Canon 4 applies to both judicial candidates and to non-candidate judges. See 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1. We review the constitutionality of these clauses only as they apply to judicial candidates.

. These clauses are subject to certain other requirements and exceptions listed in Canons 4.2 and 4.4 of the Code. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canons 4.2(A)(5), B(3) & 4.4(B)(1). We deal with these additional requirements and exceptions in more detail below.

. According to the Minnesota Secretary of State, Wersal has now filed to run in 2010 against Associate Justice Helen Meyer for the position she now occupies on the Minnesota Supreme Court. Minnesota Secretary of State, Candidate Filings, http://candidates.sos. state.mn.us/ (follow "Judicial Offices” hyperlink) (last visited June 23, 2010).

. Canon 4.1(A)(4)(b) also prohibits a judicial candidate from making "a contribution to a candidate for public office.” Wersal has not challenged the application of the "contribution clause,” and we refrain from reviewing it.

. "For purposes of this Code, the term [political organization] does not include a judicial candidate's campaign committee....” 52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology, "Political Organization.”

. Giving the term "candidate,” its ordinary or natural meaning, see Crawford v. Metropolitan Government of Nashville and Davidson County, - U.S. -, 129 S.Ct. 846, 850, 172 L.Ed.2d 650 (2009), means "a person who seeks an office.” Random House "Webster’s Unabridged Dictionaiy 304 (2d ed. 1997). Since Wersal is seeking an elected office, he is a "candidate.” Accordingly, under a plain reading of the clause, it prohibits Wersal from soliciting funds for his own candidacy.

. As Justice O'Connor aptly notes, “If the State has a problem with judicial impartiality [or its appearance], it is largely one the State brought upon itself by continuing the practice of popularly electing judges.” White I, 536 U.S. at 792, 122 S.Ct. 2528 (O’Connor, J., concurring).

. In White II, we noted that "the underinclusiveness of Canon 5's partisan activities clause clearly established]” that judicial openmindedness was not "sufficiently compelling to abridge core First Amendment rights.” 416 F.3d at 759. Specifically, we held that "the partisan-activities clause [left] appreciable damage to the supposedly vital interest of judicial openmindedness unprohibited, and thus Minnesota’s argument that it protects an interest of the highest order fails.” Id. at 760. While the same may be said of the clauses at issue in this case, we pass on the question of whether openmindedness constitutes a compelling interest, focusing our analysis instead on the narrow tailoring of the clauses.

. Wersal only challenges the "endorsement” provision of the clause.

. Appellees argue that endorsements are not necessary to run an effective campaign. Such an inquiry, however, is irrelevant as to whether restricting endorsements burdens core political speech. Instead, the inquiry is whether the infringed expression would communicate relevant information to the electorate. See White I, 536 U.S. at 782, 122 S.Ct. 2528 ("We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.”).

. Relying on a notion of separation of powers, the White II dissent crafted a similar independence interest noting that "[t]he separation of powers interest is a concern for institutional independence that is distinct from concern for impartiality in any of the senses identified by [White I].” White II, 416 F.3d at 773 (Gibson, J., dissenting). The White II court, however, rejected such a “separation of powers” interest as a compelling interest. Id. at 752 n. 7. In particular, we noted two reasons why judicial independence is not a compelling interest: (1) no other court "has ever determined that a state's interest in maintaining a separation of powers is sufficiently compelling to abridge core First Amendment freedoms;” and (2) “nothing in our opinion ... serve[d] to further blur any existing lines between the judicial, legislative and executive branches of Minnesota state government.” Id. Today, appellees continue lo rely on the separation of powers to support the endorsement clause, yet they only cite one unreported district court case in which such an interest was even discussed: Carey v. Wolnitzek, No. 3:06-36-KKC, 2008 WL 4602786, at *9 n. 10 (E.D.Ky. Oct. 15, 2008), aff'd in part, vacated in part, - F.3d- (6th Cir. 2010). However, undermining their assertions is the fact that the Wolnitzek court itself refused to identify a separate interest in judicial independence, noting that any such interest was "subsumed within the compelling state interests in prohibiting judicial bias against parties and preserving judicial open-mindedness.” Id. Thus, we still find no court which finds the interest in maintaining a separation of powers sufficient to abridge core First Amendment expression. And, just as was the case in White II, nothing in our opinion today serves to blur the lines between the three branches of government.